724 A.2d 745

**CARRIAGE HILL CABIN JOHN, INC.**

v.

**MARYLAND HEALTH RESOURCES PLANNING COMMISSION, et al.**

No. 388, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Feb. 25, 1999.

184

186

188

Joseph L. Bianculli, Arlington, VA (David Abse, Edgewater, on the brief), for appellant.

C. Frederick Ryland, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellee, Maryland Health Resources.

Jack Tranter (Thomas C. Dame and Gallagher, Evelius & Jones, LLP, on the brief), Baltimore, for appellee, HMC Retirement Properties, Inc.

Argued before MURPHY, C.J., and HOLLANDER and KENNEY, JJ.

HOLLANDER, Judge.

This appeal arises from a fierce competition that began in 1991, pitting three health care providers in a battle to obtain the requisite Certificate of Need from the Maryland Health Resources Planning Commission (the "Commission"), appellee,

for the development of new nursing home beds in Montgomery County (the "County"). The competitors, Carriage Hill–Cabin John, Inc.[1] ("Carriage Hill" or "CHCJ"), appellant, Marriott Retirement Communities, Inc. ("MRCI" or "Marriott"),[2] appellee, and Montgomery InterCare Associates ("InterCare"), all sought the right to develop a maximum of 84 comprehensive care beds,[3] allocated to the County under the State Health Plan.

Ultimately, on November 13, 1995, the Commission issued a Final Decision approving Marriott's proposals and denying the competing applications submitted by Carriage Hill and Inter-Care. Thereafter, Carriage Hill and InterCare sought review of the Commission's decision in the Circuit Court for Montgomery County. In April 1997, following a stipulated remand to the Commission, the Commission issued a lengthy "Final Decision Revised on Remand" (hereinafter, the "Revised Decision"), again approving Marriott's applications. In a written opinion dated November 17, 1997, the circuit court affirmed. Only Carriage Hill has challenged that decision;[4] InterCare is not a party to the appeal.

---

1. Appellant has alternately spelled its name with and without a hyphen.

2. At the time, MRCI was a wholly owned subsidiary of Marriott Corporation. In October 1993, as part of a corporate reorganization of Marriott Corporation, the assets of the parent corporation and its subsidiaries were divided between two companies—Host Marriott Corporation and Marriott International, Inc. As part of this reorganization, MRCI became HMC Retirement Properties, Inc., a subsidiary of Host Marriott Corporation. Unless otherwise indicated, we shall refer generically to MRCI and HMC as "Marriott," and we shall use the name Marriott Corporation when we mean the original parent corporation. We shall discuss in Section V, *infra*, the issues spawned by Marriott Corporation's reorganization.

3. A "comprehensive care facility" ("CCF") is defined as "a facility which admits patients suffering from disease or disabilities or advanced age, requiring medical service and nursing service rendered by or under the supervision of a registered nurse." COMAR 10.07.02.01B(6). A comprehensive care bed is commonly called a nursing home bed.

4. Several months after noting its appeal, appellant sought to stay enforcement of the Revised Decision. That request was denied by this Court on April 9, 1998.

Appellant presents the following questions for our review, which we have reformulated slightly:

I. Did the circuit court adequately address and resolve all of the potentially dispositive legal issues raised below by Carriage Hill and, if not, should this Court remand the matter to the circuit court to do so?

II. Did the circuit court err in concluding that the Commission complied with the procedural requirements of the Administrative Procedure Act and the Commission's own procedural regulations?

III. Did the circuit court err in concluding that the Commission's denial of Carriage Hill's application was based on the Commission's valid interpretation and application of its regulations?

IV. Did the circuit court err in concluding that, in approving Marriott's applications, the Commission complied with its regulations?

For the reasons set forth below, we shall affirm.

## I. Statutory and Regulatory Framework

The Maryland Health Planning and Development statute (the "Act"), Md.Code (1982, 1996 Repl.Vol., 1998 Cum.Supp.),[5] §§ 19–101 through 19–123 of the Health–General Article ("H.G."), was enacted "to promote the development of a health care system that provides, for all citizens, financial and geographic access to quality health care at a reasonable cost." H.G. § 19–102(a); *see Adventist Healthcare Midatlantic, Inc. v. Suburban Hosp., Inc.*, 350 Md. 104, 106, 711 A.2d 158 (1998); *Catonsville Nursing Home, Inc. v. Loveman*, 349 Md. 560, 573–74, 709 A.2d 749 (1998); *Sinai Hosp. v. Maryland Health Resources Planning Comm'n*, 306 Md. 472, 473, 509 A.2d 1202 (1986). To effectuate its goal, the Legislature created the Commission, a State administrative agency, "and

---

5. Certain provisions of the Act were amended while the CON proceedings were pending before the Commission. Unless otherwise indicated, we shall refer to the current version of the Act, because the changes do not affect the outcome of the case.

charged it, among other things, with (1) developing, adopting, and periodically updating a comprehensive State Health Plan, and (2) assisting in the implementation of that plan, in part through the legislatively—established CON program." *Adventist*, 350 Md. at 106, 711 A.2d 158.

The purpose of the State Health Plan ("SHP"), in turn, "is to establish an integrated system of care that 'assures geographic and financial access to a range of quality health care services at a reasonable cost for all citizens.'" *Changing Point, Inc. v. Maryland Health Resources Planning Comm'n,* 87 Md.App. 150, 155, 589 A.2d 502 (1991) (citation omitted). The SHP identifies "unmet needs ... [and] excess services...." *Adventist*, 350 Md. at 107, 711 A.2d 158, and includes projections of need for long term care services, "to guide the Commission's actions and to foster specific action in the private sector." *Changing Point,* 87 Md.App. at 155, 589 A.2d 502; *see* H.G. §§ 19–114, 19–115, and 19–118; COMAR §§ 10.24.01.07H and 10.24.08 (1992).[6] At least every five years, pursuant to H.G. § 19–114(a), the Commission must adopt a SHP, which takes the form of regulations. *Adventist,* 350 Md. at 107, 711 A.2d 158.

The Act and the Code of Maryland Regulations ("COMAR"), § 10.24.01.01 *et seq.* (1990), require a person or entity to obtain a Certificate of Need ("CON") from the Commission in order to develop or operate a CCF. *See* H.G. §§ 19–115 through 19–118. COMAR § 10.24.01.01(A) provides, in part: "A person or health care facility *shall* have a Certificate of Need issued by the Commission before development, operation, or participation in a health care project...." (Emphasis added). COMAR 10.24.01.07K(1) requires the Commission to act on a CON application "not later than 150 days after the application has been docketed."[7]

---

6. We shall generally refer to the COMAR provisions that were in effect at the relevant time. We note that, as to certain COMAR provisions, there have been changes in both substance and numbering.

7. For reasons not addressed by the parties, it is apparent that the time requirement was not met here.

The CON is a vital part of the health care regulatory process, because it functions as the "principal mechanism" for implementing the SHP. *Maryland Gen. Hosp. v. Maryland Health Resources Planning Comm'n,* 103 Md.App. 525, 528, 653 A.2d 1029, *cert. denied,* 339 Md. 355, 663 A.2d 72 (1995). Indeed, the *Loveman* Court described the CON requirement as the "teeth" of the Act. *Loveman,* 349 Md. at 575, 709 A.2d 749. Like the SHP, it is meant "to assure an efficient and effective health care system for Maryland...." *Maryland Gen. Hosp.,* 103 Md.App. at 528, 653 A.2d 1029; *see United States ex rel. Joslin v. Community Home Health of Maryland, Inc.,* 984 F.Supp. 374, 381 (D.Md.1997).

Pursuant to H.G. § 19–118(c)(1), the decision of the Commission concerning a CON application "shall be consistent with the [SHP] and the standards for review established by the Commission," unless a public health threat exists. *See Adventist,* 350 Md. at 107, 711 A.2d 158. The burden to demonstrate such compliance rests on the applicant. COMAR § 10.24.01.07H(1).

■ Unlike the development of the SHP, which is a "quasi-legislative function," *Adventist,* 350 Md. at 122, 711 A.2d 158, the CON process is "quasi-judicial." *Id.* at 123, 711 A.2d 158. This is because "individual rights, duties, entitlements, or privileges are at issue." *Id.* Accordingly, CON proceedings constitute "a contested case, subject to the procedural protections afforded by title 10, subtitle 2 of the State Government Article...." *Id.* Therefore, an evidentiary hearing must conform to the contested case procedures of the Administrative Procedure Act. *Adventist,* 350 Md. at 108, 711 A.2d 158.

■ When, as here, several applicants seek to develop more nursing home beds than are projected as needed by the SHP, the Commission must conduct a comparative review of the competing applications. *See* COMAR § 10.24.01.07B(2). The comparative review process applies to "two or more applications for similar projects serving the same or overlapping service areas." *Maryland Gen. Hosp.,* 103 Md.App. at 529, 653 A.2d 1029. It is intended to determine "not simply

whether a particular applicant satisfied the basic criteria for a CON, but which of the applicants best satisfied the criteria." *Id.*

H.G. § 19–118 is titled "Action on applications." Under the version of the Act in effect at the outset of this matter, Md.Code (1990 Repl.Vol.), H.G. §§ 19–101 et seq., the Commission was authorized to delegate to a committee "the responsibility for review of [a CON] application, including the holding of an evidentiary hearing." H.G. § 19–118(d)(2). The Committee would then make a recommendation to the full Commission. H.G. § 19–118(d)(3). Thereafter, under H.G. § 19–118(d)(4), the Commission was required to "vote to approve, approve with conditions, or deny the [CON] application on the basis of the committee's recommendation and the whole record before the committee."

Effective June 1, 1995, H.G. § 19–118(d) was substantially revised. H.G. § 19–118(d)(3) now permits the Commission to delegate to a "reviewer" the responsibility to evaluate a CON application. The reviewer may hold evidentiary hearings and prepare a "recommended decision for consideration by the full Commission." H.G. § 19–118(d)(3)(ii); *see* H.G. § 19–118(d)(8). Further, the Commission is authorized to designate a "single Commissioner to act as a reviewer" for competing CON applications. H.G. § 19–118(d)(4). In addition, under H.G. § 19–118(d)(7)(i), the staff of the Commission is specifically deemed an interested party. Pursuant to H.G. § 19–118(d)(11), the Commission is required to "vote to approve, approve with conditions, or deny the [CON] application on the basis of the recommended decision, the record before the staff or the reviewer, and exceptions and arguments, if any, before the Commission." *See Adventist,* 350 Md. at 107, 711 A.2d 158.

In considering CON applications, the Commission is obligated to consider, *inter alia,* eight criteria set forth in COMAR 10.24.01.07H(2)(a)–(h). The criteria include, in summary, the following: (a) compatibility with the SHP, including the Long Term Care Services provisions of COMAR 10.24.08.05F and 10.24.08.06A (1992); (b) the "need of the population" served or

to be served; (c) the "less costly or more effective alternatives"; (d) the "financial viability of the proposal"; (e) the extent of a "positive impact on the health care system of the area"; (f) the "availability of non-financial resources"; (g) research needs; and (h) "Compliance with relevant State and federal legal requirements." COMAR § 10.24.01.07H(1) places the burden of proof on the applicant to establish satisfaction of the review criteria. "[W]hen all of the applicants otherwise would qualify for the CON because they meet all of the other standards and policies," *Maryland Gen. Hosp.*, 103 Md.App. at 532, 653 A.2d 1029, approval policies "come into play...." *Id.* These "are, in essence, preferences, or tie-breakers." *Id.*

The Commission's decision regarding a CON must also satisfy certain requirements. In accordance with the Commission's regulations, the decision of the Commission "shall be in writing and based on a written opinion stating the reasons and grounds for the Commission's decision." COMAR 10.24.01.07K(5). Additionally, under COMAR 10.24.01.07K(2), the decision

> shall include findings of fact and conclusions of law based solely on the testimony, the examination and evidence included in the formal project record, on the memoranda filed, if any, on the evidence, incorporated by reference into the record of the proceeding, on information and data in the record of the proceeding, and on matters as to which the Commission has taken official notice, which matters shall be made known to the parties to the proceeding.

"The end result [of the CON process] is an adjudication, containing findings of fact, conclusions of law, and an order." *Adventist*, 350 Md. at 123, 711 A.2d 158.

## II. Factual and Procedural Summary [8]

In April 1991, CHCJ, Marriott, and InterCare filed competing CON applications, which were docketed in June 1991,

---

8. Notwithstanding the duration and complexity of this case, appellant's Statement of Facts is strikingly short, apparently because appellant

seeking the Commission's approval to develop up to 84 new nursing home beds authorized by the SHP for the County in 1994. Specifically, appellant sought to develop a new facility in Potomac that would include 84 CCF beds, 56 assisted living apartments, and 6 domiciliary care beds, at a projected cost of $9,069,396.00.[9] Marriott filed two CON applications. In the first, it sought approval to add 16 CCF beds to an existing 43–bed comprehensive care unit, which was part of a continuing care retirement community called Bedford Court. Located in Silver Spring, Bedford Court also had 76 domiciliary care beds and 215 independent living units. Marriott planned to increase the size of the comprehensive care unit by converting 16 rooms from single to double occupancy, at a projected cost of $108,680. In the other CON application, Marriott sought approval to develop a new facility in North Bethesda called Brighton Gardens, which would include 41 comprehensive care beds and 101 domiciliary care beds, at a projected cost of $13,515,344.00. InterCare sought approval to develop James Creek Nursing Center in Olney, which would include 84 CCF beds and 15 domiciliary care beds, at an estimated cost of $7,603,328.00. Because the combined number of proposed CCF beds requested by the three applicants exceeded the SHP's projected need of 84 CCF beds for the County in 1994, the Commission undertook a comparative review of the competing applications. *See* COMAR 10.24.01.07B(2); the Long Term Care Services Chapter of the SHP, COMAR 10.24.08.05E and .06A; and the review criteria in COMAR 10.24.01.07H(2)(a)–(h). At one time or another in this protracted process, each applicant was recommended for approval by at least one of the reviewing authorities.

On June 26, 1991, pursuant to H.G. §§ 19–111 through 19–113 and COMAR 10.24.01.07I, the applications were submitted

---

does not challenge the factual findings of the Commission. In our view, a detailed factual summary is essential to understand and resolve appellant's numerous assignments of error.

**9.** The Commission's approval is not required for assisted living or domiciliary care beds.

for review and comment to the Montgomery County Health Department (the "Department"), the local health planning agency. Concluding that the "Carriage Hill—Cabin John proposal offers a project that is 'ready to go' and will help to meet [the] outstanding need for [nursing home] beds," [10] the Department issued a written recommendation to the Commission in August 1991, supporting Carriage Hill's application. The Department took into account the success of two other Carriage Hill facilities in the County, the location of the proposed project, and that CHCJ owned the land and had already obtained zoning approval for the project.

On January 21, 1992, in its first written report, the Commission Staff recommended disapproval of all the projects, based on COMAR 10.24.08.05F(2), which required every nursing home in the County to have at least a 95% occupancy level before approval of additional comprehensive care beds.[11] Thereafter, the parties agreed to limit the first phase of evidentiary hearings, held in April 1992, to the threshold issue of the occupancy rate. On December 16, 1992, Commissioner Mary Etta Mills, acting as the hearing officer, agreed with the Staff and recommended denial of all four applications, based on the occupancy requirement.

The Commission rejected that recommendation in February 1993. It decided, instead, to waive the 95% occupancy requirement, pursuant to COMAR 10.24.08.05F(2)(b). The

---

**10.** The Montgomery County Commission on Health, an advisory body to the County Council and the County Executive, endorsed InterCare's application, although it had some concerns regarding the financing and the location of the project. The Commission on Health is not the designated local health planning agency, however.

**11.** COMAR 10.24.08.05F(2) stated:

(a) The Commission will approve a Certificate of Need application for new or expanded services only if every nursing home in the jurisdiction had maintained, on average, a 95 percent occupancy level or better for at least the latest 12 month period shown in Medicaid Cost Reports for the latest fiscal year, or the Commission's latest Long Term Care Survey if no Medicaid Cost Report is filed.

(b) The Commission will allow an applicant to show evidence as to why this rule should not be applied.

Commission was concerned that many area facilities had low occupancy levels because they did not participate in Medicaid. Because those facilities served only a limited portion of the market for long term care services, it concluded that the occupancy rate was not coextensive with the County's need for CCF beds. Accordingly, the comparative review process proceeded.

The Staff issued a second report in April 1993, again recommending against approval of any of the proposals. As to Carriage Hill, the Staff determined that it had not documented a memorandum of understanding reflecting its commitment to serve the Medicaid population. With respect to InterCare, the Staff found that its project was inconsistent with the "less costly or more effective alternative" criterion, and InterCare failed to explain the reasons for its higher costs. Regarding Marriott's applications, the Staff indicated that it had not explained how the design features of its facilities satisfied the needs of its patients, nor did it provide documentation showing professional and community support for its proposals.

Thereafter, in late 1993, Commissioner Gregory Hunter held an evidentiary hearing that consumed eight days. Subsequently, in a third report issued by the Staff on March 4, 1994, the Staff endorsed Marriott's projects. The Staff was satisfied that Marriott's design features would meet the needs of its patient population, and that it demonstrated community and professional support for its projects. Moreover, the Staff found that Marriott's proposed projects best satisfied the review criteria concerning the "less costly or more effective alternatives." The Staff also recommended against approval of the projects of CHCJ and InterCare. Although the Staff concluded that appellant showed a commitment to serving the needs of Medicaid patients, the Staff found that Carriage Hill's proposal was inconsistent with the less costly or more effective alternative criterion. It also suggested that appellant could endeavor to relocate unused CCF beds from its existing facilities to avoid adding new beds. Concluding that, in certain respects, Intercare's project was not financially

viable and its design was not consistent with the review criteria, the Staff recommended against InterCare.

Evidentiary hearings resumed in March 1994 with regard to the Staff's, March 1994 report. At the hearing, the parties questioned Barbara Johnson, the Assistant Director of the CON program and principal author of the Staff report, regarding the Staff's recommendation of Marriott. Ms. Johnson explained: "[I]n this case this is a comparative review, not all applicants can be approved, so you have to choose." With this in mind, Ms. Johnson observed that appellant might encounter zoning problems, while the Marriott projects did not face any concerns regarding zoning. She also observed that the Marriott projects did "not have any community opposition."

In March 1994, InterCare filed a motion entitled "Motion of Montgomery InterCare Associates to Dedocket Applications of Marriott Retirement Communities for Transfer of Projects." It claimed that the applicant for the two Marriott projects was not the same entity that would actually operate them, in violation of COMAR 10.24.01.06D(1). In addition, InterCare alleged that Marriott's sale of Bedford Court to an unrelated third party constituted an improper sale of the CON.

Subsequently, in June 1994, pursuant to a motion filed by Marriott, Commissioner Hunter recused himself, for reasons unrelated to this appeal. Consequently, Commissioner Joan Harris was appointed as the hearing officer. In connection with her responsibilities, she made several site visits to the proposed project locations and to the applicants' existing facilities in the County.[12]

On November 2, 1994, Marriott filed a "Motion to Dedocket and Cancel the Certificate of Need Applications of Carriage Hill–Cabin John, Inc.," claiming, *inter alia,* that CHCJ made material misrepresentations to the Commission and that its zoning status was uncertain due to its modifications to the proposed project. In December 1994, Commissioner Harris

---

12. Commissioner Harris later advised the Commission that she also spent 33 hours reviewing transcripts from prior hearings and devoted additional time to a thorough review of the entire record.

conducted an evidentiary hearing focusing largely on the rival motions to dedocket.

In April 1995, following a total of twelve days of hearings that began in 1993 and involved three hearing officers, Commissioner Harris issued her recommendation. She urged approval of the InterCare project, as modified, and denial of the proposals submitted by Marriott and Carriage Hill. After comparing the applications in terms of the review standards, rules, and criteria, she concluded that each applicant satisfied COMAR 10.24.07H(2)(a)–(h) and the Long Term Care provisions of the SHP.

Commissioner Harris considered as the dispositive issue the need to provide more comprehensive care beds to the Medicaid population and other underserved groups. The Commissioner acknowledged: "In determining which of the applicants would best serve the low income, underserved population one must wrestle with minuscule differences." Although each applicant had signed a Memorandum of Understanding committing itself to serve Medicaid patients, Commissioner Harris found that InterCare had the "longest and best track record in accessibility to low-income persons." Because Marriott was seeking the fewest beds, she reasoned that it would serve fewer Medicaid patients than the other two applicants. As to Carriage Hill, the Commissioner was concerned because its existing facilities did not participate in the Medicaid Assistance Program. Moreover, she believed those facilities contributed to the problem with the occupancy level that nearly prevented any project from receiving a CON. Commissioner Harris reasoned:

> To award an applicant a CON to fill a perceived need, when that need was in part brought about by the facilities in the jurisdiction that did not participate in the Medicaid Program, of which this applicant operated two such facilities, would defy all logic.

Commissioner Harris also urged the denial of InterCare's motion to dedocket Marriott's applications and Marriott's motion to dedocket the application of CHCJ. Nevertheless, as to the motions to dedocket filed by both Marriott and InterCare,

she noted that "some of the information contained in the motions [did] ... cause one to doubt the forthrightness of both Marriott and Carriage Hill." Commissioner Harris stated, in part:

> Specifically, as regards the Marriott reorganization, the split of the corporation into two separate corporations, and selling most of the nursing unit facilities to an unrelated entity leaves considerable doubt as to the future involvement of the Marriott organization in the nursing care field despite the 40–year lease agreement. The disclosure of this reorganization came only at the eleventh hour of the review, and quite by accident, when an article appeared in the *Washington Post*. Because of the article and the concerns it raised, Marriott agreed to make available the Sale Agreement to all the parties in this review. Perusal of the agreement showed no areas that were questionable from a legal perspective, but it raised considerable concern about Marriott's commitment in the area of nursing care facilities. Further, the agreement included a statement regarding the Bedford Court facility that would result in a $1,000,000 increase to be paid to Marriott if the CON is granted within two years of the closing of the sale agreement.
>
> In addition, as regards CHCJ, the fact that this applicant is providing contradictory statements to two separate governmental agencies regarding the actual building that is to be constructed on its site causes considerable loss of credibility regarding the other statements that it has made during this review. The Hearing Officer is greatly concerned about the statements made by Ms. Luckett regarding the Commission's practice of routinely allowing an applicant to change its design after the award of a CON. The Commission may have allowed design changes to a previously approved project, but that is done only when it is absolutely necessary and due to no fault of the applicant. Clearly, such is not the case in the CHCJ project as it is currently constituted.

(Footnote omitted).

Appellant and Marriott subsequently filed exceptions challenging Commissioner Harris's proposed decision, arguing

that she ignored evidence in the record indicating that the InterCare proposal was inconsistent with various SHP standards and review criteria, including InterCare's financial feasibility. In its exceptions, CHCJ did not assail Commissioner Harris's conclusion that Marriott Corporation's reorganization or financial transactions did not preclude the award of the CONs to Marriott. Marriott excepted to the proposed denial of its motion to dedocket appellant's CON application. Similarly, InterCare excepted to Commissioner Harris's proposed denial of its motion to dedocket Marriott's applications.

In response to the proposed decision, the Staff filed a document entitled "Staff's Reply to the Exceptions of the Applicants." It agreed with Commissioner Harris's "central reasoning in choosing an applicant other than [appellant] for the limited number of beds available in this review." Observing that the primary reason the Commission waived the 95% occupancy rule was to increase access for Medicaid patients, the Staff noted that Medicaid patients were not accepted at other Carriage Hill facilities. The Staff thus suggested that "it would be illogical, in the absence of strong reasons, to approve a third Montgomery County facility for Carriage Hill over another qualified applicant to try to solve the Medicaid access problem in Montgomery County." The Staff also "focus[ed] on those areas where Staff disagreed with the proposed decision." Because Marriott demonstrated that its proposals were financially viable and because the "Staff . . . [did] not believe that InterCare's psychogeriatric program should be preferred over Marriott's," the Staff supported Marriott.

On June 11, 1995, the Commission held an exceptions hearing at which arguments were presented by Commissioner Harris, the Staff, and attorneys for appellant, Marriott, and InterCare. After consideration of the March 1994 Staff Report, Commissioner Harris's proposed decision in favor of InterCare, and the parties' arguments, the Commission voted on two motions. The first motion, to adopt Commissioner Harris's proposed decision, failed by a vote of three to six. The second motion, to adopt the Staff Report recommending

Marriott's applications, carried by a vote of six to three. For both votes, two commissioners recused themselves and one abstained.

Thereafter, on November 13, 1995, the Commission issued a lengthy, written Final Decision approving Marriott's two projects. Although the Commission's Final Decision acknowledged the filing of Marriott's motion to dedocket CJCH's application, the decision did not resolve the exception concerning the proposed denial of that motion.

Appellant and InterCare subsequently sought review of the Commission's decision in the circuit court. In January 1996, shortly after those challenges were lodged, Marriott sought a limited remand to the Commission for determination of its unresolved motion to dedocket Carriage Hill's application. Marriott asserted that a limited remand was necessary, because the circuit court could not otherwise consider Marriott's argument attacking Carriage Hill's challenge to the Commission's decision.

On April 3, 1996, pursuant to an agreement of the parties, the circuit court entered an order for a stipulated limited remand, in order to obtain a ruling from the Commission with regard to Marriott's motion to dedocket Carriage Hill's application. The stipulation stated, in pertinent part:

> The parties agree that in the event that the [Commission] ... issues a Revised ... Decision that addresses the Marriott Motion, such a Revised ... Decision shall be deemed to be the [Commission's] ... Final Decision for purposes of this Appeal....

Thereafter, on April 8, 1997, the Commission issued its Revised Decision, consisting of some 94, single-spaced pages of text. Apart from several paragraphs updating the procedural history of the matter and addressing Marriott's motion to dedocket the Carriage Hill application, the Revised Decision was identical to the Final Decision issued in November 1995. Like the Final Decision, the Revised Decision reviewed the procedural history and the various recommendations, and it included detailed findings of fact pertaining to the review

criteria, along with conclusions of law. It also included the following order:

It is, this 13th day of November, 1995, ORDERED by the Maryland Health Resources Planning Commission that[:]

The Application of Bedford Court is hereby APPROVED.

The Application of Brighton Gardens is hereby APPROVED.

The Application of Carriage Hill Cabin John is hereby DENIED.

The Application of James Creek is hereby DENIED.

A majority of Commissioners voting and present plus at least two consumer members concurring in the result

In the lengthy "Findings of Fact" section of the Revised Decision, the Commission expressly considered each application in light of the plethora of rules, criteria, and standards governing competing CON applications.[13] The Commission determined that none of the applicants was entitled to prefer-

---

13. In view of appellant's many complaints regarding the deficiencies in the Commission's opinion, we shall list here, as briefly as possible, the many standards, rules, and criteria that the Commission considered and addressed in its Revised Decision. The Commission considered the following:

In Section III(A), the Commission considered the various proposals in "Relationship to Existing Plans." This included analysis under COMAR 10.24.01.07H(2)(a)—The State Health Plan. The SHP, in turn, included analysis of the provisions for Long Term Care Services under COMAR 10.24.08.05F, entitled "Certificate of Need Approval Rules: Nursing Homes," and COMAR 10.24.08.06A, pertaining to Nursing Home Standards.

COMAR 10.24.08.05F had six subparts that the Commission considered. These were:

| | | |
|---|---|---|
| 10.24.08.05F(1) | — | Maximum Need; |
| 10.24.08.05F(2) | — | Occupancy; |
| 10.24.08.05F(3) | — | Medical Assistance; |
| 10.24.08.05F(4) | — | Expansion; |
| 10.24.08.05F(5) | — | Multiple Bed Rooms; |
| 10.24.08.05F(6) | — | Domiciliary Care. |

Additionally, COMAR 10.24.08.06A had thirteen subparts, as follows:

| | | |
|---|---|---|
| 10.24.08.06A(1) | — | Care For Mentally Impaired Persons; |
| 10.24.08.06A(2) | — | Community Based Services; |
| 10.24.08.06A(3) | — | Non-elderly Residents; |
| 10.24.08.06A(4) | — | Medicaid Access; |
| 10.24.08.06A(5) | — | Public Water; |

ence under any SHP standard. Moreover, it concluded that the applicants generally faired equally well with regard to the various standards, rules, and review criteria.[14] With regard to the "more effective alternatives" analysis under COMAR 10.24.01.07H(2)(c), the Commission analyzed seven factors that are not specifically identified in COMAR or the Act, and gave "a preference" to Marriott's proposals. In its view, Marriott "offer[ed] the more effective projects in this review." Further, in analyzing "impact" under COMAR 10.24.01.07H(2)(e), the Commission considered three other factors not specifically identified in COMAR or the Act and concluded that Marriott's projects "will have the more positive effect on the health care system."

The determinations favoring Marriott over CHCJ with respect to the "more effective alternatives" and "impact" criteria

---

| 10.24.08.06A(6) | — | Geographic Proximity; |
|---|---|---|
| 10.24.08.06A(7) | — | Facility and Unit Design; |
| 10.24.08.06A(8) | — | Accreditation and Certification; |
| 10.24.08 06A(9) | — | Appropriate Living Environment; |
| 10.24.08.06A(10) | — | Transfer and Referral; |
| 10.24.08.06A(11) | — | Public Information and Protection; |
| 10.24.08.06A(12) | — | Research; |
| 10.24.08.06A(13) | — | Disclosure |

Further, the Commission considered COMAR 10.24.08.05E, entitled "Certificate of Need Preference Rule—Nursing Homes."

In Section III(B), the Commission addressed the review criteria set forth in 10.24.01.07H(2)(b)-(h), which we previously listed on page 195, *supra*. Two of these criteria included several more factors. Specifically, for the "more effective alternative" analysis under COMAR 10.24.01.07H(2)(c), the Commission considered seven additional factors: Community—based services for which the SHP finds need; service to underserved populations; community and professional support/opposition; site control; zoning; facility design with respect to privacy and efficiency; use of currently available resources. With regard to the analysis of "Impact" under COMAR 10.24.01.07H(2)(e), the Commission considered three more factors: need; service to the underserved; and respite and domiciliary care.

The Commission also considered the local Department's recommendation.

14. We note that the Commission determined that InterCare's proposal was only partially consistent with the community-based services standard, COMAR 10.24.08.06A(2), because of the questionable financial feasibility of its proposed services.

rested on several findings made by the Commission, as follows: (1) the zoning status of appellant's project was uncertain, because it had obtained a zoning exception in 1986 for a project that differed materially from the one presented to the Commission; (2) appellant's project was facing some community opposition; (3) even if the community opposition to CHCJ's application lacked merit, such opposition would inevitably delay implementation of the CHCJ project; (4) Marriott's projects had a more efficient facility design, because each had the physical therapy room located on the same floor as the nursing unit; (5) and appellant ineffectively used scarce resources, because it voluntarily kept out of service 46 CCF beds in two other facilities in the County at the same time that it sought additional CCF beds in this review.

Although the Commission acknowledged that Marriott raised serious concerns about appellant's ability to secure the necessary zoning approval, it rejected Marriott's motion to dedocket appellant's application. Additionally, in a lengthy footnote, the Commission rejected the contention that Marriott was not entitled to the CONs based on violations of COMAR resulting from Marriott Corporation's reorganization and financial transactions.

After the Commission issued its Revised Decision, the circuit court heard oral argument regarding the challenges to that decision.[15] On November 26, 1997, the circuit court filed its five and a half page "Memorandum and Opinion," affirming the Commission. Noting that it did "not go into great detail as to the factual background" because that was "not in dispute," the court concluded that the Commission adhered to the governing statute and regulations, Marriott was the real party in interest, and substantial evidence supported the Commission's conclusions. The court said, in part:

> While it was acknowledged that not every issue was documented and established by specific reference to testimony, the [Revised Decision] as a whole touched on all sufficient

---

15. The record does not include a transcript of the arguments before the circuit court.

issues which would have a bearing on the ultimate decision reached.

Therefore, the Court feels that the procedures of the Commission were in fact followed and that their decision was reached after a through [sic] and careful view of the evidence and facts presented.

\* \* \*

The question that the Court must decide is whether or not the testimony presented including Staff recommendations, was sufficient to establish the findings of fact by the Commission. Then the Court must decide if the final recommendation was legally correct based on the entire procedure.

The Court has carefully reviewed the Memoranda of the parties, considered the arguments of counsel and the applicable law in this area and feels that the Commission did in fact reach findings of fact which were substantiated by the evidence presented and ultimately correctly applied the law to the issues presented.

We will include additional facts in our discussion of the issues.

### III. A Summary of Appellant's Contentions

The prolonged and rather tortured history of this case involves, as appellant notes, "more than eight years of various administrative and judicial procedures...." In its legal memorandum submitted to the circuit court, appellant characterized the case as a "procedural nightmare." Nevertheless, on appeal, appellant "does not argue that it has not been afforded due process...." Nor does appellant "dispute any of the Commission's finding of fact as such...." Indeed, appellant acknowledges "that all of the applicants proposed excellent facilities" and "there is adequate evidence in the huge administrative record from which the Commission could have approved any of the applications before it." It thus concedes that "the 'substantial evidence' test for challenging agency fact finding is not implicated in this case."

Both here and below, appellant claims it has focused on "purely legal questions—matters of procedure and the interpretation and application of various Commission regulations." Appellant contests "the process by which the Commission evaluated [the] evidence." It complains that, in its Revised Decision, the Commission made "*no* findings, and offered *no* reasons" for its decision to approve Marriott's applications and reject Carriage Hill's application. Rather, after "years of administrative proceedings," appellant contends that the agency's final decision contains "new findings of fact," not set forth anywhere in the record, and "leaves unclear why and how it chose to approve the Marriott applications." Indeed, in its legal memorandum submitted below, CHCJ characterized the agency's decision as "a work of fiction."

In the "Summary of Argument" section of its appellate brief, CHCJ argues that the Commission "violated its own regulations and the Administrative Procedures [sic] Act by taking a vote that rejected, without discussion or explanation, the findings of fact of its own Hearing Officer, and then by issuing a . . . Revised Decision . . . that contained diametrically opposite findings that the Commission itself never adopted." In appellant's view, the agency's failure to provide a clear rationale for rejecting the recommendations of its own hearing officer and the Department constitutes "procedural sloppiness."

Appellant also challenges the validity of the Commission's Revised Decision, issued months after the Commission's vote, claiming it is the work product of the Commission's Staff, which "provided the *entire* rationale for the Commission's final action *and* the Commission never even purported to adopt that rationale." Further, CHCJ posits that the decision is defective because the Commission never took the "simple step" of voting to adopt the Staff's draft of the Revised Decision. Appellant argues:

> The flaw in the Commission's procedure is highlighted by the fact that Staff's draft of the "Final Decision" not only memorialized the Commission's vote, but also purported to rehabilitate Staff's recommendation nearly two years earlier

in favor of Marriott against the Hearing Officer's contrary findings and conclusions. Staff, in effect, drafted as the Commission's "findings" what amounted to a rebuttal of the cross-examination its witness had suffered, and a defense of not only the result it had recommended, but also its own rationale that the Hearing Officer had rejected.

Further, appellant asserts that the Revised Decision "purported to deny the CHCJ application—and to approve the Marriott applications—on the basis of plainly erroneous interpretation and application of the Commission's regulations." Appellant states:

> [T]he Commission's denial of CHCJ's application was based only upon an interpretation and application of the "most effective alternative" review criterion that was beyond the Commission's authority ...; the Commission failed to follow its regulations which require appropriate consideration of the recommendation of the designated local health planning agency which had recommended approval of the CHCJ application ...; the Commission purported to make findings regarding the status of CHCJ's zoning that were beyond the evidence or the Commission's expertise and authority ...; and the Commission improperly interpreted and applied its regulations to allow Marriott to sell a CON in connection with the refinancing of one of the applicant facilities.

Finally, appellant's brief is replete with criticisms concerning the circuit court's allegedly deficient review of the Commission's decision. CHCJ repeatedly complains that the "Circuit Court simply failed to address [CHCJ's] legal and procedural critiques of the Commission's ultimate decisionmaking [sic] process." In the end, according to appellant, the lower court improperly "blessed" a "sloppy decision by the Commission." Because the circuit court failed to address and resolve all of the issues that appellant raised, CHCJ urges that "the appropriate remedy is to remand the matter to the trial court to do so."

### IV. Standard of Review

The principles that govern judicial review of an administrative agency's decision are well established. We reiterate them here because, in large measure, they undergird our resolution of this case.

 Appellant urges us to remand to the circuit court so it may consider the many issues that it failed to resolve. That request overlooks our role, which requires us to review the *agency's* decision. *Ahalt v. Montgomery County,* 113 Md.App. 14, 20, 686 A.2d 683 (1996). Indeed, our function "in reviewing an administrative decision is precisely the same as that of the circuit court." *Department of Health & Mental Hygiene v. Shrieves,* 100 Md.App. 283, 303–04, 641 A.2d 899 (1994); *see Maryland State Board of Soc. Work Exam'rs v. Chertkov,* 121 Md.App. 574, 583, 710 A.2d 391 (1998); *Wisniewski v. Department of Labor, Licensing and Regulation,* 117 Md.App. 506, 515, 700 A.2d 860 (1997); *Moseman v. County Council,* 99 Md.App. 258, 262, 636 A.2d 499, *cert. denied,* 335 Md. 229, 643 A.2d 383 (1994); *Maisel v. Montgomery County,* 94 Md.App. 31, 34, 614 A.2d 1333 (1992); *Mortimer v. Howard Research & Dev. Corp.,* 83 Md.App. 432, 442, 575 A.2d 750, *cert. denied,* 321 Md. 164, 582 A.2d 499 (1990).[16]

In *Insurance Comm'r for the State v. Engelman,* 345 Md. 402, 692 A.2d 474 (1997), the Court of Appeals explained that judicial review of an administrative agency's decision is

> both narrow and expansive. It is narrow to the extent that reviewing courts, out of deference to agency expertise, are required to affirm an agency's findings of fact, as well as its application of law to those facts, if reasonably supported by the administrative record, viewed as a whole. The standard is equally broad to the extent that reviewing courts are

---

**16.** We should not be understood to approve of a circuit court's failure to consider the issues raised by a party on judicial review of an agency's decision. Nor do we suggest that we are without authority to remand to the circuit court to undertake such a review. In this case, however, we are satisfied that the circuit court's review was not so deficient or inadequate as to compel us to remand.

under no constraint to affirm an agency decision premised solely upon an erroneous conclusion of law.

*Id.* at 411, 692 A.2d 474 (internal citations omitted); see *Adventist, supra,* 350 Md. at 120, 711 A.2d 158; *United Parcel Serv. v. People's Counsel for Baltimore County,* 336 Md. 569, 576, 650 A.2d 226 (1994) (recognizing that "[j]udicial review of administrative agency action is narrow."); *CBS Inc. v. Comptroller of the Treasury,* 319 Md. 687, 697–98, 575 A.2d 324 (1990).

■ An agency's decision must be affirmed when the agency's factual findings are supported by substantial evidence in the record and the decision is legally correct. *United Parcel Serv.,* 336 Md. at 577, 650 A.2d 226; *CBS,* 319 Md. at 697–98, 575 A.2d 324; *Mortimer,* 83 Md.App. at 441, 575 A.2d 750. Substantial evidence has been defined as more than a scintilla of evidence. *Montgomery County v. Greater Colesville Citizens Ass'n, Inc.,* 70 Md.App. 374, 382, 521 A.2d 770 (1987). "In this context, ' "[s]ubstantial evidence," ... has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]" ' " *Loveman,* 349 Md. at 569, 709 A.2d 749 (citations omitted).

■ Moreover, an appellate court must "review the agency's decision in the light most favorable to the agency, since decisions of administrative agencies are prima facie correct and carry with them the presumption of validity." *Baltimore Lutheran High School Ass'n, Inc. v. Employment Security Admin.,* 302 Md. 649, 662–63, 490 A.2d 701 (1985); *see Loveman,* 349 Md. at 569, 709 A.2d 749; *Anderson v. Department of Pub. Safety & Correctional Servs.,* 330 Md. 187, 213, 623 A.2d 198 (1993); *Giant Food, Inc. v. Department of Labor, Licensing and Regulation,* 124 Md.App. 357, 401, 722 A.2d 398 (1999); *Maisel,* 94 Md.App. at 34, 614 A.2d 1333; *Cox v. Prince George's County,* 86 Md.App. 179, 187, 586 A.2d 43 (1991). In reviewing the agency's decision, we must not engage in judicial fact-finding, *Anderson,* 330 Md. at 212, 623 A.2d 198; *Board of County Comm'rs v. Holbrook,* 314 Md. 210, 218, 550 A.2d 664 (1988), nor may we supply factual

findings that were not made by the agency. *Ocean Hideaway Condo. Ass'n v. Boardwalk Plaza Venture,* 68 Md.App. 650, 662, 515 A.2d 485 (1986). Further, the inferences reasonably to be drawn from the facts are left to the agency. *Holbrook,* 314 Md. at 218, 550 A.2d 664; *see Moseman,* 99 Md.App. at 265, 636 A.2d 499. Thus, a reviewing court may not "substitute its judgment on the question whether the inference drawn [from the facts] is the right one or whether a different inference would be better supported. The test is reasonableness, not rightness." *Snowden v. Mayor and City Council of Baltimore,* 224 Md. 443, 448, 168 A.2d 390 (1961) (citations omitted); *see People's Counsel for Baltimore County v. Mangione,* 85 Md.App. 738, 751, 584 A.2d 1318 (1991).

In addition, a reviewing court may not search the record for a basis to support an agency's conclusions. Instead, we may only uphold an agency's decision if "it is sustainable on the agency's findings and for the reasons stated by the agency." *United Steelworkers of Am. v. Bethlehem Steel Corp.,* 298 Md. 665, 679, 472 A.2d 62 (1984) (citations omitted); *see also United Parcel Serv., Inc.,* 336 Md. at 577, 650 A.2d 226; *Harford County v. Earl E. Preston, Jr., Inc.,* 322 Md. 493, 505, 588 A.2d 772 (1991); *Rouse–Fairwood Ltd. Partnership v. Supervisor of Assessments of Prince George's County,* 120 Md.App. 667, 686, 708 A.2d 19 (1998).

Accordingly, "Our review of the . . . [Commission's] factual findings entails only an appraisal and evaluation of the . . . [Commission's] fact finding and not an independent decision on the evidence." *Loveman,* 349 Md. at 569, 709 A.2d 749 (citation omitted). In other words, we shall affirm the Commission's ruling if " 'a reasoning mind reasonably could have reached the factual conclusions the . . . [Commission] reached.' " *Changing Point,* 87 Md.App. at 162, 589 A.2d 502 (quoting *Bulluck v. Pelham Wood Apartments,* 283 Md. 505, 512, 390 A.2d 1119 (1978)).

In contrast to the deferential review accorded to an agency's factual findings, questions of law receive no deference on review; we are not bound by an agency's interpreta-

tion of law. *Caucus Distributors v. Maryland Sec. Comm'r*, 320 Md. 313, 324, 577 A.2d 783 (1990); *State Admin. Bd. of Election Laws v. Billhimer*, 314 Md. 46, 59, 548 A.2d 819 (1988), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989). Indeed, "a reviewing court is under no constraints in reversing an administrative decision which is premised solely upon an erroneous conclusion of law." *People's Counsel for Baltimore County v. Maryland Marine Mfg. Co., Inc.*, 316 Md. 491, 497, 560 A.2d 32 (1989) (citations omitted); *see Department of Assessments & Taxation v. Consumer Programs, Inc.*, 331 Md. 68, 72, 626 A.2d 360 (1993); *Liberty Nursing Ctr., Inc. v. Department of Health & Mental Hygiene*, 330 Md. 433, 443, 624 A.2d 941 (1993); *Ahalt*, 113 Md.App. at 22, 686 A.2d 683; *Department of Health and Mental Hygiene v. Riverview Nursing Ctr., Inc.*, 104 Md.App. 593, 602, 657 A.2d 372, *cert. denied*, 340 Md. 215, 665 A.2d 1058 (1995); *Department of Health & Mental Hygiene v. Reeders Memorial Home, Inc.*, 86 Md.App. 447, 452, 586 A.2d 1295 (1991). To the contrary, the reviewing court "must substitute its judgment for that of the agency if . . . [its] interpretation of the applicable legal principles is different" from that of the agency. *Perini Services, Inc. v. Maryland Health Resources Planning Comm'n*, 67 Md.App. 189, 201, 506 A.2d 1207, *cert. denied*, 307 Md. 261, 513 A.2d 314 (1986); *see, e.g., Roach v. Comptroller of the Treasury*, 327 Md. 438, 610 A.2d 754 (1992); *Friends School v. Supervisor of Assessments*, 314 Md. 194, 550 A.2d 657 (1988).

 When an agency's interpretation of a statute or regulation is at issue, the substituted judgment standard applies. *Rossville Vending Machine Corp. v. Comptroller*, 97 Md.App. 305, 311–12, 629 A.2d 1283, *cert. denied*, 333 Md. 201, 634 A.2d 62 (1993); *see also People's Counsel*, 316 Md. at 497, 560 A.2d 32. Accordingly, "[t]he substituted judgment test is the analysis employed when we interpret the requirements of the SHP . . . and COMAR." *Perini*, 67 Md.App. at 201, 506 A.2d 1207.

 Finally, we observe that a decision is "not in accordance with law" when it is

arbitrary, illegal or capricious. In making a determination of whether the [agency's] decision is arbitrary, illegal or capricious, the reviewing court must decide whether the question before the agency was fairly debatable. An issue is fairly debatable if reasonable persons could have reached a different conclusion on the evidence and, if so, a reviewing court may not substitute its judgment for that of the administrative agency. The fairly debatable test is analogous to the clearly erroneous standard under Rule 8–131(c) and a decision is fairly debatable if it is supported by substantial evidence on the record taken as a whole.

*Mortimer,* 83 Md.App. at 441, 575 A.2d 750 (internal citations omitted.)

With these well-honed principles in mind, we turn to consider appellant's contentions.

## V. Discussion—The Revised Decision

### A. The Circuit Court's Ruling

Appellant's first argument is captioned: "The Circuit Court Failed To Address And Resolve All of the Potentially Dispositive Issues [Appellant] Raised Below." CHCJ argues that the circuit court erred because it failed to address the many legal issues that appellant raised, including issues concerning flaws in the Revised Decision due to its "conclusory determinations" and lack of "specific findings of fact. . . ." In particular, appellant complains that the circuit court did not resolve its contentions that the Commission erred by failing to provide adequate reasons in its opinion for its rejection of the hearing officer's recommendation, by failing to explain its rejection of the local Department's recommendation, and by failing to explain adequately the reasons for its approval of the Staff's position. Further, CHCJ claims that the circuit court never addressed the allegedly defective process by which the Commission arrived at its decision. Rather, Carriage Hill characterizes the circuit court order as a "blanket rejection" of its arguments, and maintains that such "general findings and conclusions do not permit adequate appellate review."

By failing to resolve all of the issues raised by Carriage Hill, appellant urges that the court did not comply with Md.Code (1984, 1995 Repl.Vol.), § 10–222(h) of the State Government Article ("S.G.").[17] Consequently, appellant seeks a remand to the circuit court for resolution of the issues it raised in its attack upon the agency's decision. We are unpersuaded by these contentions.

Our resolution of this matter is tied directly to the standard of review that we previously outlined. Appellant's underlying contention is flawed because it is premised largely on the mistaken perception that our task involves review of the decision of the circuit court. "[T]he Court of Appeals repeatedly has proceeded directly to the review of the administrative decision itself." *Shrieves,* 100 Md.App. at 303, 641 A.2d 899 (citing *Maryland State Police v. Lindsey,* 318 Md. 325, 334–36, 568 A.2d 29 (1990) and *Motor Vehicle Admin. v. Lindsay,* 309 Md. 557, 563–64, 525 A.2d 1051 (1987)). Consistent with the principles of judicial review of an agency's decision, H.G. § 19–120(b)(1) expressly provides: "A decision of the Commission shall be the final decision for purposes of judicial review."

The authorities on which appellant relies to support its request for remand are inapposite. For example, contrary to appellant's assertion, *Lampton v. LaHood,* 94 Md.App. 461, 617 A.2d 1142 (1993), is not "virtually on all fours with the

---

**17.** S.G. § 10–222(h) provides:
In a proceeding under this section, the court may:
(1) remand the case for further proceedings;
(2) affirm the final decision; or
(3) reverse or modify the decision if a substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:
(i) is unconstitutional;
(ii) exceeds the statutory authority or jurisdiction of the final decision maker;
(iii) results from an unlawful procedure;
(iv) is affected by any other error of law;
(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or
(vi) is arbitrary and capricious.

present case." *Lampton* did not involve an administrative agency review, *id.* at 466–67, 617 A.2d 1142, and we did not order a remand because of the Orphan's Court's failure to reach all the legal issues before it. Rather, we remanded because the record was unclear as to certain critical facts that pertained to the creditor's claim, and because we could not determine from review of the record what impact a conflict of interest had on the lower court proceeding. *Id.* at 484–85, 617 A.2d 1142. Similarly, *Forman v. Motor Vehicle Admin.,* 332 Md. 201, 630 A.2d 753 (1993), is readily distinguishable from this case. There, an administrative law judge suspended the appellant's driver's license because the appellant failed to take a breathlyzer test. *Id.* at 205–06, 630 A.2d 753. The Court remanded to the agency because the *agency,* not the circuit court, failed to address an important legal issue.

### B. The Commission's Vote, the Role of Staff, and the Hearing Officer's Recommendation

Appellant argues, *inter alia,* that the Revised Decision is defective because the Commission rejected, "without discussion or explanation," the recommendation of the hearing officer, never provided the rationale for its vote, and never "purported to adopt the staff's draft Final Decision." These claims lack merit.

As we noted earlier, the Commission may delegate to a single Commissioner the responsibility for reviewing an application, conducting evidentiary hearings, and preparing a proposed decision. H.G. § 19–118(d)(3). The Staff's role in a CON review proceeding is outlined in COMAR 10.24.01.07*o*(1), which provides, *inter alia:* "The Staff shall issue its report . . . in the form of Proposed Findings of Fact, Conclusions of Law and Recommendations . . . . " Here, the Staff reviewed the applicable rules, standards, and criteria and issued an 85 page report. Nevertheless, under H.G. § 19–118(d), the Commission alone has the "final nondelegable authority to act upon" a CON application. Moreover, COMAR 10.24.01.07K(2) requires a written decision that includes findings of fact.

At the hearing held by the Commission on June 13, 1995,[18] representatives of the parties and Staff presented oral argument and were questioned by the commissioners concerning a variety of issues. The commissioners also had before them the proposed decision of Commissioner Harris favoring Inter-Care, the parties' exceptions to that recommendation, the March 1994 Staff report approving Marriott, and a detailed chronology of the procedural history prepared by the Staff.

At the end of the hearing, the Commission specifically considered two motions. The first, articulately and rather passionately presented by Commissioner Harris, urged the award of the CON to InterCare, to ensure "a willing and compassionate provider of nursing home services" and to relieve "a serious access problem" for the "low income underserved population...." That motion was defeated. Thereafter, a motion was made to "support the staff's recommendations" in favor of Marriott. After that motion was seconded, the Chair said: "The motion to accept the recommendation of the staff that is favoring Marriott is now on the floor." When the question was called, the Chair said: "All those in favor, please raise your hand." By a vote of six to three, the Chair declared: "The motion is carried." After verifying that the requisite number of consumer members of the Commission supported the motion, the Chair said: "[A]t this time ... Marriott has been awarded the application."

 The foregoing establishes that the Commission specifically voted to approve Marriott's projects, *based on the Staff's recommendation.* COMAR 10.24.01.07K(4) states: "A decision of the Commission shall be by a majority of the quorum present and voting, except that no project may be approved without the affirmative vote of at least two consumer members of the Commission." Appellant does not claim that the Commission acted without a quorum or that the vote lacked the approval of two consumer members. We are satisfied that the

---

18. We note that appellant included in the Record Extract only three pages of the transcript from this hearing. In the Appendix to the Commission's brief, it included the entire 145–page transcript.

Commission complied with COMAR when it issued the Revised Decision, incorporating the findings and conclusions of the March 1994 Staff report, in accordance with the Commission's vote.

Appellant has not referred us to any authority that mandates a second vote by the Commission to approve the actual text of either the Final Decision or the Revised Decision, and we can find none. Nor do we perceive any merit to the assertion that "the Commission never even purported to adopt" the Staff's rationale. That the Commission's Revised Decision was issued after its vote does not mean that it was not the Commission's ruling or that the process was flawed. Certainly, the Staff had no authority to issue a final opinion in the name of the Commission. To the contrary, the Final Decision and the Revised Decision carried with them the imprimatur of the Commission; they were both issued *by order of the Commission.*

We are also unable to assign error even if the Revised Decision was drafted by the Staff. CHCJ's contention in this regard is undercut by its concession below, recognizing "that agencies cannot be expected to draft every word in their orders; that is what Staff is for." Although appellant speculates that some of the commissioners may have had concerns about the Staff's final product, there is no evidence to support such a suggestion. A "Commission member who does not agree with the decision or any part of it reached by the majority of the Commission may file a written dissenting opinion...." COMAR 10.24.01.07K(8). None was filed.

In its quarrel, appellant also seems to suggest that, because the Commission disagreed with the hearing officer's recommendation endorsing InterCare, more was required of the Commission by way of explanation than if the Commission had adopted that recommendation. CHCJ points out that the Revised Decision omits specific reference to the hearing officer's objections to appellant's application. Absent those objections, appellant asserts that its application should have been approved. CHCJ also contends that the Revised Decision

failed to address the hearing officer's objections to Marriott's applications or the reasons favoring InterCare. Again, these contentions do not carry the day.

Merely because the Commission delegated to a hearing officer the responsibility to hold hearings and prepare a proposed decision, it does not follow that the Commission was obligated to adopt the hearing officer's proposal or satisfy a higher standard in order for a disagreement with a hearing officer to withstand appellate scrutiny. Moreover, we are unaware of any requirement imposing on the Commission the burden of addressing, line by line, the content of a hearing officer's recommendation. *See* H.G. § 19–118(d)(11). In this regard, *Shrieves,* supra, 100 Md.App. 283, 641 A.2d 899, is instructive.

The *Shrieves* Court explained the relationship between an agency and a hearing officer and the deference, if any, that the agency owes to the hearing officer. To be sure, an agency is required to *consider* the findings of a hearing officer, and the hearing officer's credibility determinations are entitled to special deference. *Id.* at 298–99, 641 A.2d 899. But, "it is the *final* order of the administrative agency that is subjected to deferential judicial review." *Id.* at 296, 641 A.2d 899 (citing *Anderson,* 330 Md. at 215, 623 A.2d 198).

When we compare the Commission's decision to Commissioner Harris's recommendation, it is evident to us that the Commission considered Commissioner Harris's proposed findings and recommendation. Moreover, the Commission adequately addressed, directly and indirectly, those matters with which it disagreed. For example, in its consideration of the "need" criterion under COMAR 10.24.01.07H(2)(b), the Commission pointed out that the hearing officer "erroneously interpreted the Commission's previous decision to waive the 95% [occupancy] rule." It said: "One of the concerns guiding the Commission ... was that the 95% rule not be used to block new competitors in favor of existing nursing homes that do not accept Medicaid recipients.... It does not follow from this that the applicant proposing the largest number of Medic-

aid beds [*i.e.,* InterCare, which was recommended by the hearing officer] should be approved...." The Commission also specifically "disagree[d] with the Proposed Decision's conclusion that Marriott has contributed to a Medicaid access problem in Montgomery County." Further, it adequately provided its reasons for favoring Marriott's projects over the proposal of CHCJ. Therefore, we perceive no legal error with regard to the process that culminated in the Revised Decision.

## C. The Review Criteria: The Most Effective Alternatives, Need, and Impact

CHCJ contends that the Commission's decision was arbitrary and capricious, because it improperly considered matters that exceeded the scope of its authority with respect to the more effective alternatives review criteria under COMAR 10.24.01.07H(2)(c). CHCJ avoids casting its complaint as a challenge to the factual findings of the Commission. It argues, instead, that the Commission erred as a matter of law by considering issues such as use of currently available resources and zoning. In this regard, CHCJ contends that the Commission improperly "created *new* 'effectiveness' standards dealing with the use of 'existing resources' . . . and 'questions about zoning' . . . to determine that [appellant] was not as 'effective' an alternative as Marriott."

Appellant avers that the Commission found CHCJ's application "consistent with *every* review criterion except one," *i.e.,* the "most effective alternatives" criterion. In particular, CHCJ focuses on the Commission's allegedly improper interpretation of the "most effective alternatives" review criterion, which included a "scarce resources" analysis. Appellant suggests that this analysis was the "sole basis" for the denial of its application.

Preliminarily, we reject appellant's assertion that the Commission found CHCJ's application consistent with all review criteria except the "more effective alternatives" criterion. As we see it, the Commission made several other key findings that culminated in the decision to favor Marriott over CHCJ.

For example, in its analysis of the "impact" criterion under COMAR 10.24.01.07H(2)(e), which appellant does not address, the Commission specifically concluded that Marriott would have a more positive effect on the health care system. Interestingly, although Marriott notes the Commission's favorable finding as to "impact," appellees have not challenged appellant's erroneous assertion that the Commission favored Marriott solely because of the more effective alternatives criterion. It would seem to us, however, that because appellant has not challenged the Commission's conclusion with respect to the impact criterion, it has waived any complaints as to that conclusion. *See Maryland Comm'n on Human Relations v. Downey Communications, Inc.*, 110 Md.App. 493, 519, 678 A.2d 55 (1996); *Harrison v. Harrison*, 109 Md.App. 652, 673–74, 675 A.2d 1003, *cert. denied*, 343 Md. 564, 683 A.2d 177 (1996). Consequently, its complaints as to the more effective alternative analysis are really of no moment.

In any event, in reaching its decision as to "impact," the Commission considered some of the same factors that it considered regarding the "more effective alternatives" criterion. Therefore, we shall discuss both the impact and more effective alternatives criteria together.

As to the criterion of "less costly or more effective alternatives," COMAR 10.24.01.07H(2)(c) provides:

> The availability of less costly or more effective alternatives for addressing the unmet needs identified by the applicant.... [T]he Commission shall take into account the cost effectiveness of construction plans and may consider the cost effectiveness of providing that proposed service at the applicant facility versus alternative facilities which are existing and providing the proposed service or alternative facilities which have submitted a competitive application as part of a comparative review. When costs fall within a reasonable range, cost comparisons are not relevant to this criterion, and projects may be found consistent even if one applicant's costs exceeds that of another's in a comparative review.

This criterion is composed of two prongs: the "less costly" component and the "more effective" component. Because the Commission could not award more than 84 CCF beds, and all of the applicants were generally qualified, the more effective alternatives criterion became a critical consideration. Appellant has acknowledged that the more effective alternatives element is somewhat subjective, particularly when, as here, more than one contestant meets the minimal standards.

In analyzing the "more effective" prong, the Commission articulated seven additional factors that it deemed relevant to its analysis: community-based services for which the SHP finds need; service to underserved populations; community and professional support/opposition; site control; zoning; facility design as it relates to patient privacy and efficient operation; and use of currently available resources. At the outset, we reject appellant's claim that these factors were not properly part of the "more effective alternatives" analysis. Appellant's view of this standard is too restrictive. Neither the Commission's interpretation nor its application of the more effective alternatives criterion conflicted with the plain language of the regulation. Moreover, it is the agency that "is best able to discern its intent in promulgating a regulation." *Changing Point*, 87 Md.App. at 160, 589 A.2d 502 (citing *Maryland Comm'n on Human Relations v. Bethlehem Steel Corp.*, 295 Md. 586, 593, 457 A.2d 1146 (1983)). "Thus, an agency's interpretation of the meaning and intent of its own regulation is entitled to deference." *Id.* (citing *Maryland Comm'n*, 295 Md. at 593, 457 A.2d 1146).

The Commission's conclusion in favor of Marriott as the applicant with the most effective alternative rested on four of the seven factors. The Commission determined that: (1) appellant ineffectively used currently available resources, because it intentionally took 46 CCF beds out of service in its two other facilities in the County, notwithstanding its effort to obtain additional beds for the pending project; (2) Carriage Hill's zoning was uncertain; (3) appellant faced community opposition to its project; (4) the community opposition would

inevitably result in the delay of implementation of the project; and (5) Marriott's facility designs were more efficient, because its physical therapy rooms were planned for the same floors as the nursing units.

The Commission also considered the impact criterion, pursuant to COMAR 10.24.01.07H(2)(e). It provides:

> Having a positive impact on the existing health care system of the area. For purposes of determining consistency, the Commission may judge the effects of the proposal on existing facilities, beds, services, or equipment and any excesses or deficits identified in the State Health Plan, as applicable, and whether proposals to expand existing capacity shift services, beds, and dollars to areas of unmet need from areas of identified excess.

In its consideration of the impact criterion, the Commission considered three other factors: [19] need; service to the underserved; and respite and domiciliary care. As to the need factor, it stated that it was "not convinced" that the award of the maximum of 84 CCF beds "will have the most positive effect on the system." This is noteworthy, because only Marriott sought less than 84 CCF beds. It reiterated that appellant faces "community opposition and may be opposed in future zoning actions, if such are required." Moreover, "regardless of the merits of the opposition," the Commission was concerned that "implementation of the [CHCJ] project may be delayed." Were that to occur, the Commission recognized

---

**19.** We note that COMAR 10.24.01.07H(2)(b) specifically pertains to "need" and arguably overlaps with the need factor as considered by the Commission in the context of the impact criterion. COMAR 10.24.01.07H(2)(b) states:

> The need of the population served or to be served. For purposes of determining consistency, the Commission consideration will include the need analysis (if any) included in the State Health Plan, and the special needs of low income persons, racial and ethnic minorities, women, handicapped persons, residents in a county in which a proposed medical service does not exist, and other groups which may be underserved and the extent to which groups which traditionally have experienced difficulties in obtaining equal access to health services will have access to or be impacted on by the proposed project.

that CHCJ's "services may not be brought on line in a timely manner." Further, because of CHCJ's "unused beds at its other facilities," the Commission expressly said that it had "no reason to believe that ... [CHCJ] would not also voluntarily restrict beds" again. Thus, the Commission concluded that Marriott's projects would have the more positive impact on the health care system.

In the "Summary" section of its analysis of the "Less Costly or More Effective Alternatives" criterion, the Commission emphasized the more effective prong. In concluding that Marriott's proposals were more effective, the Commission reiterated that "[z]oning is not an issue" for Marriott, its projects have "appropriate zoning" and thus they could quickly "be implemented without further zoning action." On the other hand, it said that CHCJ's zoning was "unclear," and it faced community opposition to future zoning approvals. Further, the Commission concluded that Marriott's proposed facilities had a better design than CHCJ's proposed project, based on the location of the physical therapy rooms. Thus, the Commission indicated that CHCJ's design was "less efficient" than Marriott's, "due to the necessity to transport the patients off the comprehensive care unit for therapy." Further, the Commission reiterated that it did not consider CHCJ's voluntary restriction of beds at its two existing facilities "an effective use of scarce resources." After consideration of the discernable differences that the Commission believed would have an impact upon the effective deployment of health care resources, it selected Marriott's project. As we explain below, we perceive no error.

### (1) Use of Currently Available Resources

Appellant complains that the Commission improperly penalized CHCJ because, at two other Carriage Hill facilities in the County, Carriage Hill voluntarily removed many CCF beds from service. It urges that it was improper for the Commission to consider unused beds at related facilities.[20]

---

20. Throughout the proceedings, it appears that little distinction was made between the Carriage Hill entities, which are separate corpora-

Flora Luckett, CHCJ's Chief Executive Officer, admitted under cross-examination that Carriage Hill operates two other comprehensive care facilities in the County, and they both had CCF beds that were "not in service." Luckett offered reasons for that situation, which are not relevant to the issue here. She also acknowledged that, as of the date of her testimony (i.e., November 19, 1993), the Carriage Hill facility in Silver Spring was licensed for 113 CCF beds, with a voluntary restriction to 100 beds, and only 98 of those beds were operating. At the Carriage Hill facility in Bethesda, which was licensed for 89 CCF beds, only 75 were operating.

After reviewing files for the other Carriage Hill facilities, the Staff noted that Carriage Hill's Silver Spring facility had recently increased its licensed capacity from 113 to 122 CCF beds, and the Bethesda facility had requested an increase of nine beds. Yet the Silver Spring facility's voluntary restriction to 100 beds remained in effect, and the Bethesda facility had a voluntary restriction of 74 beds. Accordingly, the Commission determined that the two other Carriage Hill facilities had a total of 37 unused CCF beds, which would increase to 46 when the Bethesda facility was licensed for the additional nine CCF beds. Thus, the Commission said: "In

---

tions. The two other Carriage Hill corporations are referred to as Carriage Hill—Silver Spring and Carriage Hill—Bethesda. CHCJ itself did not operate those facilities.

In its legal memorandum submitted below, CHCJ's counsel explained that CHCJ is a corporation whose stock is owned by the same family that owns the stock of Medical Facilities, Inc.; that corporation apparently is the owner of the two other Carriage Hill nursing home facilities in the County. CHCJ's own witness seemed to blend CHCJ and the two other Carriage Hill facilities. Flora Luckett, the Chief Executive Officer for CHCJ and director of operations for the "Carriage Hill facilities," testified as follows on November 18, 1993:

> [Counsel for InterCare]: *Carriage Hill operates two other nursing homes in Montgomery County; is that correct?*
> [Ms. Luckett]: *Yes, they do.*
> [Counsel for InterCare]: And those are, this may not be the official name but I think it's fair to refer to them as Carriage Hill—Silver Spring and Carriage Hill—Bethesda; is that correct?
> [Ms. Luckett]: That's correct.

(Emphasis added).

short, up to 46 beds which could be available for patient use in Montgomery County are controlled by Carriage Hill and kept out of service. This is not an effective use of scarce resources."

 Appellant insists that the Commission had no authority to deny Carriage Hill's CON application solely because the other Carriage Hill facilities had 46 licensed but unused CCF beds. Further, CHCJ argues that the Commission erred as a matter of law in concluding that appellant did not "appropriately" or "effectively" use its "resources", and by finding that such conduct was "not an effective use of scare resources." In addition, CHCJ contends that the Commission erred as a matter of law in stating that appellant "could accomplish much of its goal to construct a facility at the Carriage Hill Cabin John site through relocation of unused comprehensive care beds from its existing facilities." [21] In this regard, appellant posits that the Commission lacks the authority to relocate existing beds or to require a facility to do so. To the contrary, it notes that Carriage Hill could not relocate existing CCF beds without CON approval. Therefore, it urges that the Commission erred because it denied a meritorious application based on "some impressionistic determination that the applicant has a possible opportunity to obtain its beds in another way." Under the circumstances attendant here, we believe it was reasonable for the Commission to consider that CHCJ's related facilities had licensed CCF beds that were voluntarily removed from service.

*Maryland Gen. Hosp. v. Maryland Health Resources Planning Comm'n, supra,* 103 Md.App. 525, 653 A.2d 1029, is useful to our analysis. There, three Baltimore area hospitals were competing for a CON to establish an Open Heart Surgery/Percutaneous Transluminal Coronary Angiography Unit.

---

**21.** Appellant also argues that the record did not contain evidence that 46 of its CCF beds were unused or that it was feasible to relocate them. Because appellant has repeatedly represented that it is not contesting factual findings, and concedes that the substantial evidence standard is not implicated here, we decline to consider this assertion.

After the Commission awarded the CON to Union Memorial Hospital, Maryland General Hospital and St. Agnes Hospital sought review in circuit court; that court affirmed the Commission's decision. On appeal to this Court, Maryland General argued that the circuit court erred in refusing to apply the "substituted judgment" test in reviewing the Commission's alleged misapplication of Approval Policy 7, which required the Commission to "give preference to the applicant which offers *the best balance between program effectiveness and costs to the health care system as a whole." Id.* at 532, 653 A.2d 1029. Maryland General further complained that, instead of balancing effectiveness and costs, the Commission "placed an unjustifiably narrow and highly subjective emphasis on 'program effectiveness' and largely disregarded objective and quantifiable considerations of 'cost'. . . ." *Id.* at 545, 653 A.2d 1029. We disagreed with Maryland General's contention, explaining that the Commission found that "all applicants satisfied the 'cost' prong but that Union Memorial was entitled to the preference because it offered a more effective program." *Id.* We observed: "The actual balancing of these considerations is judgmental, invoking expertise of the agency; it is not a matter for second-guessing by a court." *Id.*

Appellant's arguments here are akin to those advanced by Maryland General. We reject appellant's assertion that, "[t]o the extent that the Commission purports to make a decision on such subjective, impressionistic criteria, any hope of regularity in the administrative process evaporates."

To be sure, appellant is correct that "a CON proceeding is not the proper mechanism for invalidating, declaring inapplicable, or modifying parts of the . . . [SHP]." *Adventist,* 350 Md. at 126, 711 A.2d 158. Nor may the Commission ignore specific limiting standards or criteria, or vary or waive such standards for favored applicants during reviews. Certainly, standards should not be developed on an ad hoc basis. Nevertheless, the Commission's actions in considering appellant's use of "scarce resources" did not contravene any of these principles.

### 2. Zoning, Community Opposition, and Delay

Appellant suggests that Commission "never made clear whether the issue [of zoning] actually was material to its decision to deny the CHCJ application...." It contends, however, that the Commission erred if it rejected Carriage Hill's proposal because the "status" of its zoning was "uncertain." According to appellant, the "uncertainty over the need for additional zoning approvals" was not "a good reason for preferring an applicant other than Carriage Hill...." Carriage Hill also claims that the Commission erred to the extent that it ruled against CHCJ based on its finding that Carriage Hill faced delay and community opposition to its project.

CHCJ notes that, in the Revised Decision, the Commission conceded that issuance of a CON does not require final zoning approval, and that it "routinely evaluates, and sometimes approves, CON applications that contemplate construction of a new facility on a site that may require further zoning approvals...." Therefore, appellant insists that it was improper for the Commission to deny appellant's application based on the purported uncertainty of its zoning.

Substantively, appellant denies that its zoning status was uncertain. It contends that it had already obtained a special exception and would have pursued a zoning modification, if necessary. In this regard, appellant seems to raise a factual dispute as to the certainty of its zoning status, notwithstanding its repeated assertions that it does not contest any factual findings.

■■■ As we see it, the Commission was quite clear with regard to its concerns about appellant's zoning. The question for us, then, is whether the Commission acted beyond its authority in basing its ultimate decision on the uncertainty of appellant's zoning and the related matters of community opposition and delay. We conclude that the Commission was entitled to consider zoning and the ramifications of CHCJ's unsettled zoning.

It is undisputed that Carriage Hill obtained a special exception in 1986 that had been extended until May 1995. Zoning

approval was obtained for a 64 room, "L shaped" assisted living facility containing 60,000 square feet, with an approved building footprint of 19,129 square feet. The zoning exception also contained several conditions, including that the "proposed development be in strict accordance with the specifications and requirements of the petitioner's site plan" as it was submitted when the special exception was obtained.

Notably, the shape and floor plan of the facility for which appellant sought the CON differed markedly from that for which the special exception had been procured. The contemplated project was for an "X" shaped structure containing 89,000 square feet, 125 CCF rooms, and a building footprint of 29,256 square feet. Thus, as the Commission found, "the size, the configuration and the occupancy of the [CHCJ] facility have all increased since the special exception was obtained [by CHCJ]." According to the Commission, even CHCJ recognized that the "project before the zoning board is not the same project that is the subject of the CON proceedings."

From appellant's perspective, the changes were not of significance. CHCJ suggested that, if awarded the CON, it would seek the necessary modification from the zoning board. Nonetheless, it is not seriously disputed that appellant had to secure a modification to the special exception in order to construct the facility described in the Carriage Hill application.

The Commission was also concerned about anticipated community opposition to the CHCJ project, based on the zoning issue. That concern was well founded; it derived from the testimony of Maureen O'Connor, president of the Birnam Wood Homeowners Association. She stated that the association intended "to oppose the [CHCJ] project in the zoning process if additional zoning action is needed." That opposition centered on the proximity of the proposed CHCJ facility to houses in the community, the perceived visual intrusion of the building, and the increased traffic that the new facility would generate. The Commission also expressed concern that, regardless of the merits of the community opposition, the antici-

pated opposition would delay the implementation of the CHCJ project.

Thus, in considering this issue, the Commission said, in part:

In sum, while Marriott has not demonstrated that dedocketing is required [due to CHCJ's zoning status], its arguments relating to the discrepancies between Carriage Hill's zoning approvals and its CON application has pointed up a deficiency in Carriage Hill's application, i.e., the necessity of securing further zoning approvals for the Carriage Hill project and the uncertainty attendant upon the zoning process. This is not a sufficient reason for decoketing Carriage Hill's application. Nevertheless, the uncertainty over the need for additional zoning approvals is a good reason for preferring an applicant other than Carriage Hill in this review.

\* \* \*

Zoning is not an issue for Bedford Court, which is an existing facility. Brighton Gardens states that it has approved zoning for its project.... The zoning status for the Carriage Hill project is unclear. Carriage Hill currently holds a special exception for a previously proposed project on the same site which was due to expire at the end of May 1995. The project has been redesigned and the total number of residents has been increased since the time the special exception was granted. It appears that, at the least, Carriage Hill will require an extension of its special exception. The Community association which opposes the project has indicated its intent to oppose any future zoning approvals for this Applicant.

\* \* \*

There is an unresolved issue with respect to the zoning for the Carriage Hill facility. This project is also the subject of community opposition which at the least may delay implementation of the project, if future zoning action is required. Carriage Hill's design is less efficient in terms of physical therapy location than Bedford Court and Brigh-

ton Gardens. Carriage Hill currently controls a large number of beds which it has voluntarily chosen not to use. Thus, the Commision [sic] cannot find this the more effective project.

Bedford Court and Brighton Gardens offer proposals which have demonstrated community and professional support. There is no community opposition to these projects. Both projects have appropriate zoning and can be implemented without further zoning action. Both offer designs which will enhance patient privacy. The physical therapy rooms in these facilities are located on the comprehensive care units which will allow the patients to go to therapy without leaving the comprehensive care unit. Thus, the Commission finds Bedford Court and Brighton Gardens offer the more effective projects in this review.

(Footnote omitted).

To some extent, we are puzzled by appellant's complaints regarding the Commission's consideration of zoning. After all, the parties *stipulated* to a limited remand to the Commission for the very purpose of deciding Marriott's motion to dedocket the Carriage Hill application; that motion was premised on issues regarding appellant's zoning status. In its motion to dedocket, Marriott contended, *inter alia*, that the changes to appellant's project constituted an impermissible modification of the project, while CHCJ countered that the differences were "legally inconsequential" and it would seek further zoning approval once it obtained the CON.

In its reply brief, CHCJ suggests that zoning and the other factors the Commission applied under the "less costly or more effective alternatives" analysis were improperly considered for the first time in the November 1995 Decision. The record does not support this claim. Both the March 1994 Staff Report and the hearing officer's proposed decision considered zoning and other factors in their respective evaluations of the more effective alternative. Indeed, appellant addressed some of these criteria in its exceptions to the proposed decision and in its argument before the Commission on June 13, 1995.

We are also constrained to point out that, throughout the protracted history of this case, various reviewers have considered the zoning status of the applicants' respective proposals and, when favorable to appellant, it has not objected. For example, appellant has argued, in another context, that the Department's recommendation, which favored CHCJ, should have received more consideration from the Commission. In urging that position, we note that zoning was one of the specific reasons offered by the Department to support its endorsement of appellant's proposal.

To be sure, the Commission acknowledged that it "*sometimes* approves, CON applications" that may require further zoning approval. (Emphasis added). But, that concession does not compel the Commission to disregard the matter of zoning in evaluating the criteria of more effective alternatives and impact. The Commission selected Marriott, in part, because Brighton Gardens had zoning approval for the proposed site, and Bedford Court was merely adding beds to an existing facility. Thus, if Marriott were awarded the CONs, zoning would not create an impediment to Marriott's implementation of its proposals. We are satisfied that the Commission made a "judgmental ... [evaluation] invoking the expertise of the agency...." *Maryland Gen. Hosp.*, 103 Md.App. at 545, 653 A.2d 1029.

### 3. Facility Design

In its decision regarding the more effective alternatives prong, the Commission clearly favored the designs of Marriott's facilities. The parties have largely ignored the Commission's ruling in this regard.

The Commission found that, at the proposed Marriott facilities, the physical therapy rooms were conveniently located on the same floor as the nursing unit. In contrast, according to the Commission, the physical therapy room for CHCJ would "require facility staff to accompany patients off the nursing unit, down an elevator to the therapy room and back to the patient floors." The Commission was concerned "about the location of the physical therapy rooms in the Carriage Hill ...

facilities, as it relates to efficiency of operation." It also said: "The Commission considers it more efficient to have the physical therapy room located on the nursing unit, as proposed by Bedford Court and Brighton Gardens." All things being equal, the Commission may well have had a valid "tie-breaker" based on this uncontested finding.

### 4. Need

As we noted, the Commission considered "need" as a separate criterion, pursuant to COMAR 10.24.01.07H(2)(b), and also as a factor in its analysis of the "impact" criterion. The parties have not addressed the Commission's consideration of the "need" factor with regard to the maximum of 84 CCF beds. In connection with its analysis of the impact criterion, the Commission clearly considered Marriott's proposals as preferable.

The Commission noted in its review of both the need and impact criteria that it had the right to approve up to 84 CCF beds for the County because, as of the time of the first pre-hearing conference during the CON review process, the SHP projected a need of 84 CCF beds in the County by 1994. *See* COMAR § 10.24.08.05C(1)(c). Nevertheless, the Commission observed that it was not legally obligated to approve as many as 84 CCF beds. Moreover, by the time the matter was ripe for the Commission's decision, the SHP had updated the projection of bed needs for 1994; the projected need was reduced substantially to thirteen beds needed for 1994.

In considering the factor of need when it analyzed the criterion of impact, the Commission pointed out that the Staff had considered "bed need and the occupancy rate of existing facilities" in the County. It agreed with the Staff's conclusion "that approval of a larger number of additional beds may, in fact, have a negative effect on existing facilities by further lowering their occupancy rates." It reasoned: "[W]hile the maximum of 84 beds can be approved in this review, the Commission is not convinced that doing so will have the most positive impact on the system."

Only Marriott proposed less than the maximum of 84 CCF beds. Accordingly, it is clear that the Commission weighted this matter in Marriott's favor in reaching its ultimate decision.

### D. The Local Health Department's Recommendation

Carriage Hill argues that, contrary to COMAR 10.24.01.07I(3),[22] the Commission erred because the Revised Decision did not contain a "detailed explanation" as to why the Commission rejected the Department's recommendation in favor of appellant. It also suggests that the Commission "essentially agrees with the four grounds for the local health planning agency's endorsement of [Carriage Hill]." Moreover, appellant asserts that in a comparative review as difficult as this one, the Commission erred because it should have given more weight to the Department's recommendation. Appellant's contentions are unavailing.

The local Department's participation in CON reviews is mandated by H.G. §§ 19–111 through 19–113 and COMAR 10.24.01.07H(2) and 10.24.01.07I(3). On August 27, 1991, following a public hearing, the Department recommended approval of appellant's application for several reasons:

First, Carriage Hill's track record of providing quality services in Montgomery County for more than twenty-five years;

Second, CHCJ's firm financing commitment, experience and solid plan for the facility;

Third, CHCJ's location in an area of the County where large numbers of elderly persons reside, CHCJ's control of its site and approved zoning, and the ready availability of utilities; and

---

**22.** COMAR 10.24.01.07I(3) provides:

If a local health planning agency makes a recommendation on a specific project, and the Commission makes a different decision than that recommended by the local health planning agency, the Commission shall make a written, detailed explanation as to the basis for the difference to the local health planning agency.

Fourth, the cost-effectiveness of locating all 84 beds needed under the State Health Plan at one location, and CHCJ's ability to complete the project immediately.

In our view, the Revised Decision reflects that the Commission adequately considered the Department's position. Indeed, the opinion expressly refers to the recommendation of the Department, stating, in pertinent part:

The [Montgomery County] Health Department has recommended the proposal of [appellant], for the following reasons:

1. Track Record—This organization has two existing facilities in Montgomery County providing quality services; one with 15 years and the other with 25 years of experience.

2. Financial Plan—The corporation has a firm commitment to finance the project as well as having the experience and planning process in place.

3. Location—This project has approved zoning, public water, sewer and accessible public transportation. The corporation owns the land and is working to gain community support. The project is also in an area of the county where large numbers of elderly population reside.

4. Number of beds—The project requests the total 84 beds allocated for the County by [the Commission] which will maximize the cost-effectiveness of the construction. In addition, since two other approved projects are delayed in their development and construction, the need for all 84 beds is critical.

We are satisfied that the Revised Decision provides ample reason for the Commission's rejection of the Department's recommendation. For example, in finding appellant's zoning status "uncertain," the Commission made clear that it disagreed with the Department's conclusion that Carriage Hill had "approved zoning." As to the Department's conclusion regarding the "number of beds," the Commission noted that, "as a matter of law, there is no requirement that the applicant which proposed the largest number of ... beds must be approved." Further, the Commission obviously disputed the

Department's finding that CHCJ had the best "track record", because it expressed concern with the number of CCF beds that appellant voluntarily took out of service at its two other facilities. Accordingly, we conclude that the Revised Decision, taken as a whole, satisfies COMAR 10.24.01.07I(3).

Appellant has not referred us to any authority to support its contention that the Department's recommendation should have been treated as a decisive factor because this was such a close case. As the Department's recommendation is merely advisory, and the Department is not required to take into account the same standards, rules, and criteria that the Commission must consider, we attach no merit to such an assertion. To the contrary, by statute, "The Commission *alone* shall have the *final nondelegable* authority to act upon an application for a [CON]. . . ." H.G. § 19–118(d) (emphasis added).

Moreover, if we were to adopt the logic of appellant's argument, we could just as easily say that the hearing officer's recommendation should have been the decisive factor. If that were so, appellant's cause would not be advanced; the hearing officer recommended InterCare.

### V. Discussion—Marriott Corporation's Reorganization and Financial Transactions

Appellant complains that the Commission violated COMAR 10.24.01.06D(1) because, as a result of Marriott Corporation's reorganization, the "applicant" and ultimate "licensee" of the proposed facilities were not the same entity. Appellant also contends that the Commission erred because, in effect, Marriott sold the CON for Bedford Court for $1,000,000, in violation of COMAR 10.24.01.09D.

In its brief, the Commission suggests that these issues were "thoroughly and accurately addressed [by the Commission] in its final decision." We see it differently. In unraveling the complicated and sophisticated business transactions that were at issue here, the Commission's analysis was rather abbreviated; it was consigned to a lengthy footnote in the Revised Decision. Moreover, the Commission seemed simply to adopt

Marriott's explanation. This does not necessarily equate to error, however.

Before we consider CHCJ's contentions, we shall briefly address Marriott's threshold argument of waiver. It shall not detain us long, for we are satisfied that CHCJ has not waived these claims.

## A. Waiver

■■ Marriott argues that appellant has waived its right to challenge the Commission's decision concerning the corporate reorganization and the Bedford Court financing transaction. Its position is based on CHCJ's failure to raise either matter in its exceptions to Commissioner Harris's proposed decision, in which she concluded that Marriott Corporation's reorganization and the sale-leaseback transaction did not violate the applicable criteria, rules, and standards.

In support of its position, Marriott relies on *Cicala v. Disability Review Bd. for Prince George's County*, 288 Md. 254, 418 A.2d 205 (1980). There, the Disability Review Board denied service-connected disability retirement benefits to a police officer. On appeal, the police officer argued that he was denied due process because the Board considered a recommendation by the Medical Review Committee that the Board did not receive until after the hearing. *Id.* at 261, 418 A.2d 205. Because the "attorney knew or should have known that the Board was required to obtain and consider the Committee's report," the Court rejected the officer's arguments. *Id.* at 262, 418 A.2d 205. His counsel "neither objected to [the report's] . . . absence nor requested that it be made available." *Id.* Accordingly, the Court concluded: "Because the issue of the alleged error was not raised during the administrative proceeding, it was not properly raised in the judicial proceeding . . . ." *Id.* at 263, 418 A.2d 205. The Court reasoned:

> A party who knows or should have known that an administrative agency has committed an error and who, despite an opportunity to do so, fails to object in any way or at any

time during the administrative proceeding, may not raise an objection for the first time in a judicial review proceeding. *Id.* at 261–62, 418 A.2d 205 (citation omitted).

*Cicala* is not on point. In *Meadowridge Industrial Center Ltd. Partnership v. Howard County,* 109 Md.App. 410, 421, 675 A.2d 138 (1996), we discussed *Cicala* and observed that in that case, "the issue raised by the appellant [in court] had never been raised before, or decided by, the administrative agency." In contrast, the precise issues for which Marriott asserts waiver were raised before the Commission by a co-party. We made clear in *Meadowridge* that, on judicial review, a party is not barred from raising an issue if a co-party previously raised the issue before the agency. *Id.* That is exactly what transpired here. In its motion to dedocket Marriott's CON applications, InterCare asserted improprieties based on the corporate restructuring and sale-leaseback trans-action. It then excepted to Commissioner Harris's proposed decision to deny its motion. Thus, these contentions were squarely presented to the Commission.

Appellant also addressed these same issues in its post-hearing brief, submitted to the Commission on April 29, 1994. In light of the Commission's rulings, appellant then raised the issues with the circuit court. There, it specifically argued that the applicant and the licensee were not the same entity, as required by COMAR 10.24.01.06D(1), and that Marriott en-gaged in a prohibited sale of a CON with respect to Bedford Court.

 Clearly, appellant's failure to lodge exceptions to the hearing officer's proposed decision does not offend Md. Rule 8–131(a). It provides that, "ordinarily," we will not decide any issue that does not "plainly appear[ ] by the record to have been raised in *or decided by* the trial court." (Emphasis added). The rule guards against a party's assertion of an issue on appeal that was not raised or *considered* below. Its "primary purpose [is] ... ' "to ensure fairness for all parties in a case and to promote the orderly administration of law." ' " *State v. Bell,* 334 Md. 178, 189, 638 A.2d 107 (1994) (quoting

*Banks v. State,* 203 Md. 488, 495, 102 A.2d 267 (1954)); *see Davis v. DiPino,* 337 Md. 642, 647–48, 655 A.2d 401 (1995); *In Re Levon A.,* 124 Md.App. 103, 124, 720 A.2d 1232 (1998). Both the circuit court and the Commission considered the issues arising from the corporate reorganization and financial transactions.

In addition, *Cicala* is distinguishable from this case because *Cicala* involved the failure to object at the agency level. Here, appellant's conduct was one step removed, in that it concerned the failure to except to the hearing officer's recommendation to the agency.

## B. Factual Background [23]

On October 8, 1993, as part of a corporate restructuring, Marriott Corporation was divided into two corporations. Marriott Corporation became Host Marriott Corporation ("Host") and its subsidiary, Marriott International, Inc. ("Internation-

---

**23.** The factual background is largely derived from the following: the pre-filed testimony of Philip J. Downey, Vice President of Development and Planning Regulatory Affairs for the Senior Living Services Division of Marriott International, Inc., dated November 5, 1993; the Lease between HMC Retirement Properties, Inc. and Marriott Senior Living Services, Inc. for Bedford Court, dated October 8, 1993; the Sublease and Management Agreement between HMC Retirement Properties, Inc. and Marriott Senior Living Services, Inc., dated October 8, 1993; the Purchase Agreement between HMC and HMH Properties, Inc., as sellers, and Health and Rehabilitation Properties Trust, as purchaser, dated March 17, 1994; the Affidavit of Edward L. Bednarz, Esq., dated April 18, 1994; arguments presented at the evidentiary hearings; arguments at the exceptions hearing; and appellant's memorandum submitted to the circuit court.

We are constrained to observe that appellant has failed to include in the record extract many of the documents cited above that are critical to a resolution of the issues it has raised. We have located the documents in the voluminous record, because we are mindful of the age of this case and we are interested in bringing closure to this matter. We reiterate, however, that it is not our responsibility to comb the record in search of documents relevant to an issue raised by an appellant. *See* Md. Rule 8–501; *Miller v. Bosley,* 113 Md.App. 381, 391, 688 A.2d 45 (1997); *Evans v. Shore Communications, Inc.,* 112 Md.App. 284, 310, 685 A.2d 454 (1996); *Maxwell v. Washington Metropolitan Area Transit Authority,* 98 Md.App. 502, 505–06, 633 A.2d 924 (1993).

al"), became an independent, publicly held corporation. According to appellant, the purpose of the reorganization was to "clean up" Marriott Corporation's balance sheet by "unloading" debt to Host, the successor to Marriott Corporation, in order to boost stock values. In this process, the assets of Marriott Corporation were split between Host and International. Appellant has alleged that Host inherited Marriott Corporation's "troubled" real estate holdings, while International "retained the very profitable hotel, restaurant, and retirement community management operations." On the date of the reorganization, every shareholder of Marriott Corporation received an equal number of shares in Host and International.

As part of the reorganization, Marriott Retirement Communities, Inc., which originally submitted the Marriott CON applications, became HMC Retirement Properties, Inc. ("HMC"). MRCI was previously a wholly owned subsidiary of Marriott Corporation, and HMC became a subsidiary of Host.

In connection with the reorganization, all of the senior living services business activities and responsibilities of Marriott Corporation's Senior Living Services Division were consolidated into a new entity known as Marriott Senior Living Services, Inc. ("MSLS"). That entity was created as a subsidiary of International. MSLS and International provide financial and personnel resources necessary for the development of the Bedford Court and Brighton Gardens projects. According to appellant, MRCI/HMC was identified as the applicant or owner of both Bedford Court and Brighton Gardens, and MSLS was "the prospective lessee and licensee of both facilities." Marriott advised the Commission that the officers and staff of MRCI became the officers and staff of MSLS.

HMC and MSLS entered into two agreements concerning Bedford Court that are pertinent here. The first is a "Facilities Lease Agreement", dated October 8, 1993, between HMC, as Landlord, and MSLS, as Tenant, for the Marriott Senior Living Services Facility at Bedford Court (the "Lease"). In accordance with the Lease, which is some 63 pages in length,

exclusive of exhibits and attachments, MSLS leased Bedford Court from HMC and acquired the right to operate the facility. Although the Lease has a twenty year term, MSLS has four options to renew, each for a five-year term. Therefore, HMC retained ownership of Bedford Court but, pursuant to the Lease, operating responsibility was transferred to MSLS. The Lease was amended on January 19, 1994 with respect to the calculation of the "Percentage Rental."

The second agreement, a "Sublease and Management Agreement" dated October 8, 1993 (the "Sublease"), was drafted to prevent the Lease from abrogating HMC's right to pursue the 16–bed CON for Bedford Court. The Sublease provided that, in the event HMC obtained the CON, MSLS would "sublease to HMC sufficient space in the Bedford Court Health Center to operate sixteen (16) nursing beds," and HMC would seek a nursing home license (the "Operating License") from the Maryland Department of Health and Mental Hygiene ("Health/Hygiene") to operate the 16 CCF beds. Under the "Recitals" in the Sublease, if HMC obtained the Operating License, "the parties ... intend for MSLS to operate the 16 beds [at Bedford Court] as HMC's agent and intend for MSLS to become the licensed operator of such beds as soon as legally permissible." Further, in paragraph 5, the Sublease said: "Upon issuance of the Operating license to HMC, MSLS shall manage the operation of the sixteen beds, as agent for HMC, and with full profit and loss financial responsibility. MSLS' management of the beds shall continue until the Sublease is terminated."

On March 7, 1994, HMC and HMH Properties, Inc., as sellers, and Health and Rehabilitation Properties Trust ("HRPT"), as purchaser, entered into an agreement whereby HRPT, an independent real estate investment trust unrelated to any of the Marriott companies, acquired fourteen senior living communities for $320 million dollars (the "Purchase Agreement"). It is undisputed that the Brighton Gardens project was not involved in this transaction between HMC and HRPT.

Pursuant to the Purchase Agreement, HRPT acquired ownership of Bedford Court from HMC, subject to the Lease and Sublease agreements. Under the Purchase Agreement, HRPT acquired ownership of the land, building, and equipment associated with Bedford Court, but it did not acquire any rights as to the operation of the facility. Because HRPT's ownership interest is subject to the Lease and Sublease, Marriott claims that HMC's status as the applicant for the CON for Bedford Court did not change, and MSLS operates Bedford Court pursuant to a 40–year operating lease. Marriott states: "MRCI/HMC became the licensed operator of the nursing home beds approved by the Commission, during which time MSLS operated the beds as MRCI/HMC's agent. As soon as was legally permissible, MSLS would become the licensed operator of these projects." Thus, Marriott asserted that, if awarded a CON, HMC would obtain the license and MSLS, as HMC's agent, would manage Bedford Court, while HRPT would own the physical plant.

Marriott asserts that, in the so called sale-leaseback transaction, the parties recognized that the assets being sold and leased back would have more value if Bedford Court obtained the CON for 16 additional nursing home beds. Therefore, the Purchase Agreement included adjustments to the financial terms—both the purchase price and the rent to be paid under the Lease—in the event that Bedford Court obtained the CON. Paragraph 8.03(e) of the Purchase Agreement provides:

> Purchaser and Sellers acknowledge that (x) Sellers have applied for and there is pending with respect to the Facility located in Silver Spring, Maryland a ... [CON] for sixteen (16) skilled nursing beds and (y) the Purchase Price has been determined and agreed upon in recognition of the fact that such ... [CON] will not be granted prior to the Closing. If, for any reason, such ... [CON] is irrevocably approved and issued prior to Closing, the Purchase Price shall be increased by an amount equal to $1,000,000.00. Furthermore, if such ... [CON] shall be irrevocably approved and issued on or before the date two (2) years after

the Closing Date, Purchaser shall pay to Sellers, within ten (10) days thereafter, $1,000,000.00 in immediately available federal funds to such account or accounts as Sellers may designate. The provision of this section shall survive the closing.

All of the documents that we have just summarized were furnished by Marriott to the Commission in April 1994, as part of its opposition to InterCare's Motion to dedocket. At the hearing before Commissioner Harris on December 19, 1994, InterCare's counsel contended that, under Marriott's plan, "the applicant . . . will act as a straw man and supposedly will hold the license for the 16 beds that the CON is granting momentarily before passing it on to an unrelated corporation. . . ." InterCare's counsel added: "The problem with this arrangement is it will not work. You cannot carve out a few beds within a licensed facility and license them in a different name." Marriott's counsel responded that the reorganization plan and the relationship between HMC and MSLS would have no "material impact" on Marriott's CON application for Bedford Court. She reasoned:

HMC which is the renamed MCRI continues as the applicant for these projects and what its function has really been since the time of the reorganization is a company that holds the real estate that is associated with many of Marriott's Senior Living Communities. However, MCRI's previous function, that is developing senior living communities, implementing them, overseeing their operations, that function was essentially transferred to a new subsidiary . . . [MSLS,] a subsidiary of . . . International. And accordingly, the board of directors of the former MRCI became the board of directors of MSLS, the officers and professional staff became the officers and professional staff of MSLS. Mr. Downey . . . used to be a vice-president of MRCI, he is now a vice-president of MSLS. All of the people, all of the company programs, all of the policies, the missions and goals are exactly the same. There has just been technical corporate changes as a result of the reorganization. There is nothing that has caused any sort of substantive change to

either the Bedford Court or the Brighton Gardens projects. . . .

Alternatively, Marriott's attorney suggested to Commissioner Harris that if she were concerned about HMC's plan to obtain the licenses after the CON process and, when legally permissible, for MSLS to obtain the licenses to operate the facilities, she could "completely rectify" the situation by exercising her discretion and permitting MSLS to replace HMC as the applicant for the projects. COMAR 10.24.01.07A(5)(d) allows modification of a CON application "[a]t the request of the hearing officer," if the modification does not constitute an impermissible "major modification," as defined in COMAR 10.24.01.07A(5)(c)(i)–(iv), which generally concerns a change in the proposed services. Commissioner Harris did not adopt this suggestion, however.

The Staff representative agreed with Marriott and stated that neither the larger corporate restructuring nor the sale-leaseback transaction with HRPT warranted the dedocketing of Marriott's applications. The Staff also acknowledged that HRPT was a "totally unrelated party," and explained that if it had "thought HRPT was going to be running the show after [the CON review process] was over . . . it would have supported a motion to dedocket. . . ." Under the Marriott agreements, however, it felt that was not the case. As a result, the Staff believed the real issue was "which . . . subsidiary of the former Marriott Corporation [was] going to be running the show."

These issues were raised again at the hearing held on June 13, 1995, before the Commission. InterCare's counsel argued that Marriott Corporation's reorganization resulted in "a gap between the applicant on the left and the intended licensee on the right, the one that is actually going to operate these facilities." He contended that, as a result of the reorganization, the applicant was not the person who would be the licensee and therefore Marriott's applications should be dedocketed. Marriott's counsel retorted: "[T]o criticize the Marriott reorganization, suggesting that the same people, who

were in this project from day one, who are now working as ∴ ...
[MSLS], the same people who implemented this project some-
how, because of corporate reorganization, that this project
should be thrown out the window, that is the ultimate ... in
picky."

In her remarks to the Commission, Commissioner Harris
explained her reasoning, stating: "I felt it was imprudent to
dedocket ... on what may be a technicality in terms of the
Marriott application." Thereafter, Commissioner Hall asked
the Staff representative to "address the question of the fact
that Marriott Retirement Communities, HMC Retirement
Properties, Inc. is the applicant for the two CONs, but Mar-
riott Senior Living Services, Inc. is the intended licensee."
He added: "Are we dealing in technicalities here, ... should
[we] have recognized that, in fact, we had two entities instead
of the licensing entity being the same as the applicant?" The
Staff representative responded:

> Staff's position was that this was a technicality. Marriott
> is obviously a very large corporation which underwent a
> spinoff slightly at approximately the time of the evidentiary
> hearing in this case. After the spinoff was said and done,
> ... there were actually two sides, two different organiza-
> tions which developed at that time with identical ownership.
>
> \* \* \*
>
> The designated entity was actually on one side of the big
> structure, and the one who would actually be operating was
> on the other side of the structure. They organized this so
> that the license would be essentially transferred once the
> applicant is licensed.
>
> I think it is really a technicality because everybody that
> was in this proceeding testifying on behalf of Marriott is
> going to be working in the entity that is actually running
> the project.
>
> That is really what staff's position was.

As we noted, the Commission's ruling as to these matters is
contained in a lengthy footnote in the Revised Decision. The
Commission stated, in part:

HMC will become the licensed operator of the beds at both facilities. InterCare argued that the sale of the Bedford Court project means that the HMC applications should be dedocketed because they violate COMAR 10.24.01.06D(1). This regulation requires that an applicant for a Certificate of Need be the entity that will become the licensee of the proposed facility. As noted, HMC will be the licensee upon project certification. While HMC acknowledges that the license will ultimately be transferred to MSLS, the Commission finds that this does not violate Commission regulations. COMAR 10.24.01.06D(1) does not prohibit subsequent transfers of licenses. Moreover, the policy underlying the regulation is not violated by the planned transfer because, after the Marriott reorganization, all individuals responsible for the Bedford Court and Brighton Gardens projects became MSLS employees. In addition, all the officers and professional staff of MRCI, HMC's predecessor, became officers and staff of MSLS. Accordingly, there is sufficient identity between the applicant and the persons who will ultimately develop and operate the proposed projects to enable the Commission to adequately assess the party who will ultimately operate the facility.

The Commission also concluded that the financial transaction with HRPT

> ... had no practical effect on Bedford Court, which continues to be operated by MSLS pursuant to a 40–year operating lease.

Therefore, the Commission denied InterCare's motion to dedocket Marriott's applications.

Following the approval of its applications, Marriott began implementation of its proposals. Sixteen additional CCF beds were licensed at Bedford Court in December 1996 and have been operational since that time. The Brighton Gardens facility has been constructed; 41 CCF beds and 100 assisted living beds have been licensed and operational for several months, although the record does not indicate the licensee. The record does show that, on December 12, 1996, HMC

obtained a license to operate Bedford Court from "Health/Hygiene", pursuant to H.G. § 19–318(a). The license indicates that it expired on December 13, 1996, the day after it was issued. Also included in the record is a license to operate Bedford Court, dated December 13, 1996, in the name of MSLS; it expired on December 12, 1998. Both the license issued to HMC and the one issued to MSLS read "License No. 15–050."

We shall include additional facts in our discussion.

## C. Discussion

### 1. Marriott Corporation's Reorganization

Appellant contends that the Commission's decision to award the CONs to Marriott violated COMAR 10.24.01.06D(1), which provides:

> If proposed facilities would require licensure after certification, the applicant shall be the person or persons who will be the licensee as set out at Health–General Article, § 19–318, et seq.[24]

Appellant claims that HMC, the applicant in the CON review, and MSLS, the entity intended to be the licensee upon approval, were separate corporate entities, contrary to the mandate of COMAR 10.24.01.06D(1). Moreover, Carriage Hill argues that it is irrelevant to the regulatory scheme that the "same individuals" remained responsible for developing the Marriott projects after the corporate restructuring.

 In essence, appellant posits that the Commission misconstrued COMAR 10.24.01.06D(1). "A challenge to a regulatory interpretation is, of course, a legal issue." *Riverview Nursing Ctr.,* 104 Md.App. at 602, 657 A.2d 372. The same canons and rules of construction used to interpret a

---

24. H.G. § 19–318 through H.G. § 19–325 address the procedures for obtaining a license from the Secretary of Health and Mental Hygiene. H.G. § 19–318(a) provides: "A person shall be licensed by the Secretary before the person may operate a hospital or related institution in this State." Nursing homes are "related institutions" under the provisions of this Act. *See* H.G. § 19–301(*l*)(1)(i).

statute apply when we are called upon to construe an agency's regulation. *See Maryland Comm'n on Human Relations, supra,* 295 Md. at 592–93, 457 A.2d 1146. Accordingly, our primary consideration is the language of the regulation. When the terms of the regulation are unambiguous, there is no need to look elsewhere to determine the agency's intent. *See Prince George's County v. Vieira,* 340 Md. 651, 658, 667 A.2d 898 (1995). Moreover,

> [u]pon appellate review, courts bestow special favor on an agency's interpretation of its own regulation. Recognizing an agency's superior ability to understand its own rules and regulations, a "court should not substitute its judgment for the expertise of those persons who constitute the administrative agency from which an appeal is taken."

*Reeders Memorial Home, Inc.,* 86 Md.App. at 453, 586 A.2d 1295 (citation omitted); *see Riverview Nursing Ctr.,* 104 Md. App. at 602, 657 A.2d 372 (noting that "courts give special weight to an agency's interpretation of its own regulations"). We perceive no error with regard to the Commission's interpretation and application of COMAR 10.24.01.06D(1).

It is undisputed that Marriott's proposed facilities required licensure upon certification. In *Loveman v. Catonsville Nursing Home, Inc.,* 114 Md.App. 603, 691 A.2d 693 (1996), we said:

> [The Commission] is not a licensing agency; the CON required under the health planning law is not a license to operate a facility. Nursing homes, as "related institutions," require a license from the Secretary of Health and Mental Hygiene.... That is a separate requirement.

*Id.* at 606 n. 2, 691 A.2d 693 (internal citations omitted); *see* H.G. §§ 19–318, 19–319, 19–301(1). Therefore, COMAR 10.24.01.06D(1) applied here.

Here, the Commission concluded that the Bedford Court and Brighton Gardens applications complied with the regulation because HMC, the applicant for both projects, would be the licensee. Although the Commission acknowledged that the license would "ultimately be transferred to MSLS", it

concluded that such an action did not offend COMAR 10.24.01.06D(1), "because the regulation does not prohibit *subsequent* transfers of licenses." (Emphasis added). Equally important, the Commission found that, notwithstanding the transfer, all of the individuals responsible at the outset for the Marriott projects became MSLS employees and were still involved in the projects. Thus, it concluded that "there is a sufficient identity between the applicant and the persons who would eventually develop and operate the proposed projects to enable the Commission to adequately assess the party who will ultimately operate the facility."

The Commission correctly observed that the terms of the COMAR regulation do not address a subsequent transfer of a license by an applicant that is awarded a CON. Nor does appellant refer us to any authority that bars a subsequent transfer under the circumstances attendant here. Because HMC, the applicant, became the initial licensee of the projects, however briefly, it complied with the literal dictates of CO-MAR 10.24.01.06D(1).

To be sure, we would not countenance an end run around COMAR. Nonetheless, in the context of this case, it is apparent that the Commission reasoned that it would be exalting form over substance if it were to conclude that the corporate reorganization mandated the denial of Marriott's applications. It found (and appellant does not contest the factual findings) that many of Marriott's employees who were involved with the projects before the restructuring remained involved with the projects following the reorganization. This finding clearly undergirded the Commission's decision.

In its brief, the Commission asserts that "[h]ealth care corporate reorganization and acquisition activities are a frequent and significant element in the modern business of health care." It also contends that "Commission regulations, as referenced ... give it the authority to examine [a CON request] ... when those transactions detrimentally alter the circumstances of the terms of the application...." In the case *sub judice,* the Commission claims that it examined the

transactions and determined that the change was not prohibited or otherwise detrimental. As we see it, that conclusion is consistent with the purpose of COMAR 10.24.01.06D(1).

The parties agree that the provision is intended to insure that the Commission evaluates the persons or entities who will actually be developing and operating a facility. In reviewing the corporate reorganization, the Commission determined that the individuals and entities that would ultimately be involved in the operation of the facilities were involved from the outset. Based on the finding that there was a sufficient identity between the applicant and those who will operate the facility, the regulation requiring that the applicant also be the licensee was effectively met.

In reaching our decision, we consider it noteworthy that Marriott advised the Hearing Officer and the Commission about its reorganization, although news reports may have been a catalyst for some disclosures. In his pre-filed testimony of November 5, 1993, Philip Downey, the vice president for the newly formed MSLS, outlined the reorganization and its impact on the CON process. Notably, he specifically disclosed MSLS's intent to become the ultimate licensee of the Bedford Court and Brighton Gardens facilities upon CON approval. He said: "Although it is anticipated that as soon as legally possible, MSLS will become the licensed operator of these projects, if approved, HMC will be responsible for all obligations under the CON and comprehensive care license until such time as MSLS does become the license holder."

Moreover, in correspondence of August 1993 between Health/Hygiene and Michael J. Stein, an attorney for Marriott, informed that agency of Marriott Corporation's impending reorganization. He stated:

> It is our understanding that the transactions described above will require a change of license holder at Bedford Court from HMC to MSLS. It is important to point out, however, that the same individuals will be responsible for the day to day operation of the Community and that the corporate management and administrative support staff of

MSLS will also consist of the same individuals who presently perform those functions at Marriott.

Furthermore, as we noted, in its written opposition to InterCare's motion to dedocket Marriott's applications, Marriott supplied the Commission with all of the relevant documents, so that the agency could undertake the necessary evaluation of the transactions. Then, at the hearing before Commissioner Harris, Marriott requested that, if the Commissioner found its applications inconsistent with COMAR 10.24.01.06D(1), she should use her discretion and allow Marriott to rename MSLS as the applicant. The Commissioner declined that request, essentially because she did not consider it necessary. She recommended the denial of the Motion to dedocket, which was founded on these claims.

We are also mindful that this particular issue might not have surfaced if the process had proceeded more expeditiously. All of the applications were filed in 1991, and the restructuring occurred in 1993, well after the proceedings should have been completed. *See* COMAR 10.24.01.07K(1).

Accordingly, under all the circumstances, we conclude that the Commission properly determined that Marriott did not offend COMAR 10.24.01.06D(1).

## 2. The Sale–Leaseback Transaction

Appellant contends that Marriott illegally sold the CON authorizing the additional 16 CCF beds for Bedford Court, and therefore the Commission's award of the CON to Marriott contravened COMAR 10.24.01.09D. It provides:

Tranferability. Except as provided in these regulations, a Certificate of Need is not transferable.

Appellant also complains that the Revised Decision failed to address the underlying question of whether the sale of Bedford Court included a prohibited sale of a CON. Rather, without explaining its rationale, CHCJ argues that the Commission "simply repeats Marriott's assertions" that the reorganization and sale-leaseback were of no legal consequence.

Appellant's claim is premised on the Purchase Agreement between HMC and HRPT, which included a provision by which HRPT would pay Marriott an additional $1,000,000.00 if the Commission approved the CON for Bedford Court. Carriage Hill posits: "Viewing the deal from a practical perspective, if no CON is awarded, Marriott does not receive the $1 million." Therefore, it insists that Marriott was, in effect, selling its CON for $1,000,000.00.

In its Opposition to InterCare's motion to dedocket Marriott's applications, Marriott reiterated that the Purchase Agreement simply provided for the purchase by HRPT of the land and building for the Bedford Court facility, while operational responsibility remained vested in MSLS, as agent of HMC, pursuant to the Sublease. Further, it contended that the "potential payment of an additional $1 million to HMC simply reflects the increased value of the property HRPT acquired if 16 CCF beds are added to the 43 CON-exempt CCF beds already operational at Bedford Court." Marriott explained that, under the Lease, MSLS's rental payments for the facility are based on a percentage of its operating revenues. Consequently, "[i]f the number of licensed beds at the facility increases, MSLS's rental payments to its new landlord, HRPT, will also increase." Marriott concluded: "Consistent with the sale-leaseback nature of the HMC–HRPT transaction, if the anticipated rental payments to HRPT increase, then the purchase price paid to HMC should also increase. . . . [HRPT] has not bought and will not operate nursing home beds."

In the footnote addressing this issue, the Commission stated:

Following the reorganization . . . Host and HMC sold fourteen senior living services properties to Health and Retirement Properties Trust (HRPT), an independent real estate investment trust unrelated to any of the Marriott companies. That sale did not involve the Brighton Gardens project. It had no practical effect on Bedford Court, which continues to be operated by MSLS pursuant to a 40 year operating lease. The HRPT purchase of Bedford Court had

no effect on the operating lease or MSLS's right to operate Bedford Court. In addition, even though HMC transferred its property interest in Bedford Court to HRPT, it retained a leasehold interest in the facility with respect to the 16 beds sought for Bedford Court in this review.

InterCare, ... brought a motion to dedocket the Marriott applications in light of the sales to HRPT described above. The Commission denies this motion. Those sales have no effect on the HMC proposals. Brighton Gardens was not a subject of this sale. Although Bedford Court was sold to HRPT, its application is unaffected. HMC will become the licensed operator of the beds at both facilities.

In its brief submitted to this Court, the Commission points out that because no CON existed at the time of the sale-leaseback transfer, Marriott's business transaction could not have violated COMAR 10.24.01.09D. It asserts: "The clear language of the regulation only applies to a transfer of a CON, not of a potential CON." The Commission reasons that because the challenged transaction occurred before Marriott received the CON, no CON was transferred. Our problem with this argument is that this was not the basis for the Commission's decision. As we pointed out earlier, we may only uphold an agency's decision if "it is sustainable on the agency's findings and *for the reasons stated by the agency.*" *United Steelworkers of Am.,* 298 Md. at 679, 472 A.2d 62 (citations omitted) (emphasis added).

Alternatively, the Commission argues that no matter what financial transactions took place concerning the Bedford Court facility, the dispositive factor was "the identity, both before and after the sale transaction, of the personnel operating the facility." To support its argument, the Commission relies on *Loveman, supra,* 349 Md. 560, 709 A.2d 749.

There, Catonsville Nursing Home, Inc. ("CNH") and the Commission challenged a circuit court ruling that certain "bed rights" belonged to the landlord, Mr. Loveman, who was the original operator and licensee of the nursing home. He had not operated the facility since 1981, however, when he had to

surrender his nursing home administrator's license due to a medicaid fraud conviction. *Id.* at 564, 709 A.2d 749. Ultimately, CNH became the operator and licensee, and Mr. Loveman was merely the owner of the building "housing the nursing home operation and CNH's landlord. . . ." *Id.* at 564, 709 A.2d 749.

The Commission had determined that the right to seek Commission approval regarding the CCF beds at the nursing home belonged to CNH as the lessee and operator of the facility, rather than to Mr. Loveman as the "owner of the bricks and mortar. . . ." *Id.* at 566, 709 A.2d 749. Mr. Loveman disagreed. He argued that "the bed rights in question, which [were] derived from the right to operate a health care project as provided in a CON or exemption, run with the land because the physical facility itself was exempted from obtaining a CON when the new statutory scheme was enacted. . . ." *Id.* at 566, 709 A.2d 749. The exemption provided that facilities that were " 'completed and in operation on or before June 1, 1978,' " were not required to obtain a CON. *Id.* at 575, 709 A.2d 749.

The Court rejected the landlord's position. It concluded that the statutory exemption does not create a real property right. *Id.* at 580, 709 A.2d 749. Writing for the Court, Judge Cathell explained:

> The exemption is personal to the person or health care operator that operated the health care project prior to 1978 and, if not waived or abandoned, may continue to apply to the specific health care project so long as it remains in operation. That exemption remains with the project and its operator and does not run with the specific land upon which the project may have operated prior to 1978 or with the "bricks and mortar" of the building itself. Furthermore, the exemption may be waived when the person or operator of the health care project becomes otherwise unqualified to hold a license by reason of criminal convictions for medicaid fraud or other applicable convictions, when he acquiesces in the obtainment of a CON by subsequent operators for the

operation of the project, or when he ceases to operate the health care project for a significant period of time.

*Id.* at 586, 709 A.2d 749 (footnote omitted).

Of significance here, the Court also said:

"If ... the exemption right attaches to the physical building, this would defeat not only the Commission's function, but the Act's purpose.

\* \* \*

For us to find for ... [Mr. Loveman] would divest the Commission of its power to implement the SHP, thwart the intention of the legislature, and effectively grant appellee a monopoly as to ninety-eight beds of needed capacity forever, regardless of whether appellee used them and regardless of the need of the community. This cannot be what the General Assembly intended."

*Id.* at 585, 709 A.2d 749.

If the exemption from the CON requirement is personalty, it follows that the CON itself is also personalty, not realty. Moreover, as in *Loveman,* the Commission essentially determined that HRPT was merely the landlord, not the operator of Bedford Court. After scrutinizing the transaction, it determined that, notwithstanding the sale of the building to HRPT, the personnel responsible for the operation of the facility remained unchanged. That was the key to its decision. The Commission considered it dispositive that HRPT had no rights in relation to the operation of the 16 CCF beds. Consequently, it found that there was no sale of a CON and thus no violation of COMAR 10.24.01.09D.

In reaching our conclusion, we are mindful that:

The General Assembly gave the Commission the power to regulate the placement of health care projects, the types of services offered, and the number of persons to be served in an attempt to reduce the number of unused or unuseful projects throughout the State.

*Loveman,* 349 Md. at 580, 709 A.2d 749. Like the Commission, we do not "view the transfer regulations as prohibiting

corporate affiliation or acquisition transactions *per se*," because that "would render the 'CON process [too] inflexible in the current health care business climate.'"

We defer to the Commission's expertise and affirm the approval of Marriott's CON applications.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**